**FINLEY v. EXCHANGE TRUST CO. et al.**

No. 26770.    March 15, 1938.

Rehearing Denied May 24, 1938.

Application for Leave to File Second Petition for Rehearing Denied June 21, 1938.

N. E. McNeill and J. A. Talbot, for plaintiff in error.

Houston E. Hill, Mildred D. Bestic, John Rogers, Gibson & Holleman. Edward H. Chandler, Summers Hardv, R. L. Imler, West & Davidson. Norton Standeven, Tucker & Martin. F. A. Bodovitz. Duff & Manatt, Conner & Winters, Logan Stephenson, Q. M. Dickason, Geo. S. Ramsey. Villard Martin, and Garrett Logan, for defendants in error.

RILEY, J.  This is an action commenced

in the district court of Tulsa county against the Exchange Trust Company of Tulsa, a corporation, H. L. Standeven and some 18 others, directors of said corporation, R. M. McCool, liquidating agent of said trust company, and W. J. Barnett, State Bank Commissioner. Plaintiff sought cancellation of a trust agreement entered into with the Exchange Trust Company in 1926; judgment against the trust company and the several directors sued, for the sum of $40,000, the full amount of money placed in said trust; and for an order directing the liquidating agent and State Bank Commissioner to turn over to plaintiff any and all funds, and such securities as were found to be safe, in their hands, and for the appointment of a receiver to administer such securities in said trust as might be found to be unsafe; to the end that they be sold and the proceeds be applied toward the payment of such judgment as plaintiff might obtain.

In substance, the petition alleges many alleged breaches of trust and carelessness and mismanagement of the trust estate, such as commingling the money and property belonging to the trust estate with money and property belonging to the trust company; commingling the funds of said trust estate with funds belonging to other trust estates being administered by the trust company; selling securities belonging to the trust company or certain affiliated companies to the trust estate here involved; buying from itself as trustee safe securities held in the trust estate, and replacing same with unsafe, unmarketable securities held by the trust company or its affiliated company in which the directors of the trust company, or many of them, were directors; using the trust funds of said estate together with the trust funds of other trust estates in making loans or buying securities by either the trust company or its affiliated company, and charging commissions for making said loans and other transactions allegedly for the benefit and profit of said trust company or its affiliated company, or indirectly for profits to and benefit of the directors of the trust company, and particularly such of them as were stockholders or directors in the affiliated company referred to and known as the Exchange National Company. Forty thousand dollars in money was put into the trust estate by plaintiff.

The trust agreement, after authorizing the trustee to invest, reinvest, loan all amounts deposited with it, and invest all interest and accumulations of said trust, provides:

"In making or disposing of any investments, the Trustee may purchase the same from, or sell the same to, any corporation, association, partnership or firm which may be affiliated with the Trustee or in which the Trustee may in any other way be interested, as freely as it might or could deal with an independent third party, and without any greater responsibility, and said trustee is hereby expressly given the right and authority to sell securities which have been negotiated by it to this trust upon the same terms and conditions as securities of like kind and character are sold to other investors or customers of said Exchange Trust Company, all rules and provisions of law to the contrary being hereby expressly waived."

And:

"This trust estate shall continue during the lifetime of the Trustor, Georgia A. Finley, unless revoked by her during her lifetime, as hereinafter provided."

And:

"The said Georgia A. Finley reserves the right to revoke this trust at any time upon giving the Trustee sixty (60) days notice in writing of her intention so to do. Provided. that the said Georgia A. Finley, upon the revocation of this trust. agrees to accept all of the mortgages. notes, bonds, securities and other properties contained in said trust at the time of the revocation and agrees to assume all the existing contracts, leases, agreements and other obligations incurred in reference to the trust estate by said Trustee and agrees to fully release and discharge the trustee from all liabilities and obligations of every kind affecting said property so held in trust."

The petition in substance alleges that during the time said estate was being administered by the trustee, it and its affiliated companies came into possession of many securities which were not safe investments, and known by the directors to be unsafe or undesirable investments, and which could not be disposed of or sold to the general investing public, and especially to persons and companies where independent investigation was made as to the value: and about 1928 the trustee began and thereafter continued a systematic plan whereby good securities held in said trust were sold and undesirable securities were substituted therefor. so that plaintiff's trust estate was in effect made a dumping ground for unsafe, unsalable, and undesirable securities held by the trustee and its affiliated companies.

Some 14 or 15 separate transactions or

transfers of securities were specifically set out in the petition as being in the class above described. These covered substantially the whole corpus of the trust estate, except about $624.71 in money which was uninvested at the time the trust company became insolvent and was taken over by the State Bank Commissioner, July 29, 1933.

The answers of the several defendants put in issue the allegations of plaintiff's petition concerning which there is any controversy. The principal issues joined go to the question of alleged negligence, mismanagement, and dereliction of duty on the part of the trust company and the defendant directors. Some defendants pleaded that the action was prematurely brought, others plead the statute of limitations, etc.

After issues were joined, the cause was referred to a referee with directions to take and transcribe the evidence, return same to the court with his findings of fact and conclusions of law, with the further order that all matters and evidence so taken and transcribed be considered as brought up without the necessity of a bill of exceptions.

Trial was had before the referee and evidence was taken, which, including exhibits, covers some 800 pages in the record.

The findings of fact and conclusions of law made by the referee were against the contention of plaintiff entirely as to the defendants who were directors of the trust company. Findings of fact and conclusions of law were made in favor of plaintiff and against the trust company on the question of negligence, mismanagement, etc., as to three investments made by the trust company for the trust estate, referred to in the record as the "Collins loan," for $1.500; the "Abbott loan," $14,000, and the "Hackleman loan," $1,032.35.

Recommendation was for judgment for plaintiff against the trust company for the amounts covered by these three investments. Findings of fact and conclusions of law were made in favor of all defendants as to all the other investments held in the trust estate at the time the cause was tried. All requests of plaintiff for findings of fact and conclusions of law were denied.

The trial court adopted and approved the findings of fact and conclusions of law made by the referee in their entirety, and judgment was rendered accordingly. That is, judgment for plaintiff against the trust company on the "Abbott loan" for $14,000, with interest at 6 per cent. from September, 1931, with first lien on the note and mortgage then in the hands of A. D. Blackford, special trustee for the Finley trust, for its foreclosure, etc., and directions to apply the proceeds to the satisfaction of the judgment, the deficiency, if any, to be allowed as a general claim against the assets of the trust company, but not a prior lien. Similar judgment was entered as to the "Collins loan" and the "Hackleman loan." Judgment was for the trust company on all other "loans or investments" involved, and judgment was for all the defendant directors. From this judgment, plaintiff appeals.

Plaintiff first contends that under the law the trustee is bound to keep clear, distinct, and accurate accounts. If he does not, all presumptions are against him; that the trustee here did not keep such accounts.

The proposition of law is correctly stated. But we are not able to agree with the assertions that the trustee did not in this case keep clear, accurate, and distinct account of the transactions as to the "Finley trust." Without going into detail as to the manner of keeping its accounts, as shown by the evidence, we think it sufficient to say that from the books and records of the trust company it is easy to trace every dollar of the funds placed in the trust throughout the entire time the trust company was handling the trust. It appears, and the referee found, that during the operation of the trust 33 real estate mortgage investments were made for it; 17 of these were paid before the trust company became insolvent. The exact amount of the funds of the Finley trust that went into each of these investments is shown. The exact amount that was received when any of these mortgages were paid or sold is shown. The exact amount in each of the investments at the time the trust company closed business is shown. The amount of uninvested money belonging to the trust estate at the time the trust company closed is shown to the cent. It is conceded to be $624.71. That amount has since been paid to plaintiff. There is no claim that this amount is not correct, or that it is even in doubt. There is likewise no claim that the true amount placed in and received from all the investments is not shown or that there is doubt as to a single item. The contention that accurate accounts were not kept cannot be sustained.

The next contention is made under two propositions presented together, viz.: (1)

Trustee must keep the funds of each trust separate and distinct from his own funds and other trust funds; and (2) where funds of a trust estate are not kept separate and distinct, but are commingled with other trust funds under a general plan where they can be and are used to make investments therefrom in its own name, and the income therefrom is converted to the trustee's own use, the trustee (in this case the trustee and its directors) becomes liable upon the theory of conversion.

We do not understand that plaintiff in this case contends that the trustee commingled the funds of plaintiff's trust estate with funds belonging to the trust company. The record does not so show. The record does disclose, however, that the Exchange Trust Company, during the period in which the Finley trust was operating, had many other trust accounts or estates, some four or five hundred. At times the total trust funds being administered by the Exchange Trust Company in all its trust estates amounted to ten or twelve million dollars. As money was paid to the trustee, either in the several trusts, or in collections for their benefit, the money would be deposited by the trustee in the Exchange National Bank of Tulsa in one account known and designated as "Exchange Trust Company, Trust Account."

Prior to the organization of the Exchange National Company, loans would be made by the trust company and notes and mortgages would be taken in its name. As funds in the several trust estates became available, the loans so made would be "purchased" by the trustee company, as trustee, for some particular trust estate and the notes and mortgage would be assigned accordingly. In some cases where the loan or mortgage so made would be in excess of the amount available for investments in any one trust estate, the security would be divided and portions assigned to two or more trust estates. In such case participation certificates were issued showing the extent of the interest of each trust estate in the security.

After the organization of the Exchange National Company, loans would be made by it, and notes and mortgages taken in its name. When investments were to be made by the trustee, assignments of notes and mortgages were taken from the Exchange National in the same manner. In making these loans the trust company, and later the Exchange National Company, would charge the borrower a commission for making the loan. The funds acquired by these common charges were said to be used in carrying out what was termed a "service agreement" going with most, if not all, of the investments made by the trustee. This service agreement was in effect a promise or guaranty by the trust company, or later the Exchange National Company, to guarantee the trust estate from loss because of failure of the borrowers to pay taxes on the mortgaged property, failure to keep same insured, and an agreement to collect interest or other income, and principal when same became due, and pay same over to the trustee.

It is of this plan and manner of handling the funds of the several trust estates which plaintiff complains.

In support of plaintiff's contention on the proposition of commingling of funds are cited In re Union Trust Company (N. Y.) 114 N. E. 1057: St. Paul Trust Co. v. Strong (Minn.) 88 N. W. 256; In re Riordan's Will (Iowa) 248 N W. 21; Strauss v. U. S. Fidelity & Guaranty Co., 62 Fed.2d 174, and similar cases. They all hold in effect that the receipt of trust funds and the deposit thereof in a general account along with funds belonging to the trustee is a breach of trust imposing liability on the trustee. While it is said in some of the cases that trust funds should be kept separate from other trust funds, none of the cases hold directly that a failure so to do renders the trustee liable as for conversion or other breach of trust. The commingling of trust funds with funds belonging to the trustee individually is the thing which is condemned and is in each case made the basis of, or given as the reason for, the holding that there was a breach of trust.

In this case the evidence does not show commingling of trust funds, and particularly the trust funds belonging to the Finley trust, with funds belonging to the trustee as a deposit of trust and private funds in the same account. The evidence shows the contrary.

The question then arises, Does the deposit of trust funds belonging to one trust estate in the same trust account with the funds of other like trust estates amount to a commingling of funds so as to constitute a breach of trust? We are cited to no case which so holds.

In Restatement of the Law of Trusts, vol. 1, p. 457, the general rule is stated as follows:

"Where the trustee holds the funds of

numerous beneficiaries, and it would be unreasonable and not subserve any purpose in protecting the interests of the beneficiaries of the several trusts to require him to keep separate the funds of the different trusts, it may be proper for the trustee to mingle funds of the different trusts by deposit thereof in a common bank account. Thus, ordinarily a trust company can properly deposit in a single trust account in another bank the funds of several trusts, provided that it keeps an accurate record of the contributions of the separate trusts."

The record discloses that loans were made and mortgages taken in the name of the Exchange Trust Company, and later in the name of the Exchange National Company, and later sold or assigned to the Exchange Trust Company as trustee. In some cases where the amount of the notes and mortgages thus obtained was more than the trustee had in uninvested funds of any one trust estate, the notes or securities would be and were apportioned to two or more trust estates. This was done in some cases with the Finley trust.

Plaintiff contends that this was not permissible as being an unwarranted commingling of trust funds.

Such investments are not necessarily improper.

In Restatement of the Law of Trusts, vol. 1, p. 650, it is said:

"The mere fact that trust funds are combined with funds not held in trust or with funds of other trusts in making investments does not necessarily make the investments improper, provided that the investments are in other respects proper. Thus, an investment of trust funds in a participating interest in one or more first mortgages on land, or in a group of securities which are all proper trust investments, may be a proper trust investment."

Such investments, however, are not proper if they are not such as a prudent man would make of his own property having primarily in view the preservation of the estate and regularity of income. Ibid.

In Avery v. Union Trust Company of N. Y. (N. Y.) 114 N. E. 1057, it is held:

"The combination of trust funds for investment is generally recognized as proper for a trustee. the advantages that are frequently to be secured by combining trust funds to make a large and more satisfactory investment than can be made of the funds of one trust without combination being of sufficient importance and value to the several trust funds to overcome any disadvantage that may arise from the fact that the several owners of the investments may. thereafter differ in the matter of handling the same."

It is contended that that part of the trust agreement authorizing the trustee to buy securities from the trust company, and as trustee sell securities held as such to the trust company, is fraudulent and void, or at least voidable.

It is the universal rule that, in the absence of a statute or provision in the trust agreement therefor, a trustee may not sell his individual property to the trust estate, nor buy, as an individual, property from the trust estate of which he is trustee.

Plaintiff cites numerous cases holding that such transactions are void. But in none of them does it appear that authority therefor was expressly granted in the trust agreement.

In Restatement of the Law of Trusts, vol. 1, p. 440, it is said:

"By the terms of the trust the trustee may be permitted to sell trust property to himself individually, or as trustee to purchase property from himself individually, or to lend to himself money held by him in trust, or otherwise to deal with the trust property on his own account. The trustee violates his duty to the beneficiary, however, if he acts in bad faith, no matter how broad may be the provisions of the terms of the trust in conferring power upon him to deal with the trust property on his own account."

Unless such a provision in a trust agreement is expressly prohibited by law. or is against public policy it is not void. We are cited to no case which holds such a provision to be against public policy.

The cases cited holding such transactions void are therefore not applicable, for the reason that in none of them was the authority given by the terms of the trust.

The only questions that remain go to the question of good faith. diligence, etc.. of the trust company in making the investments other than the Collins, Abbott. and Hackleman loans. and whether or not the judgment denying any relief against the defendant directors of the Exchange Trust Company is against the clear weight of the evidence.

The standard of care and skill required of a trustee is said to be the external standard of a man of ordinary prudence in dealing with his own property. A trustee is liable for a loss resulting from his failure to use the care and skill of a man of ordi-

nary prudence, although he may have exercised all the care and skill of which he was capable, and if, on the other hand, the trustee has a greater degree of skill than that of an ordinary man, he is liable for a loss resulting from failure to use such skill as he has. Restatement of Law of Trusts, vol. 1, sec. 174, p. 448.

This rule applies whether or not the terms of the trust empower the trustee to sell to the trust estate his individually owned property, or buy from such trust estate individually, property or securities belonging to the trust estate.

We are inclined to hold that where a trust agreement, as here, empowers the trustee to buy from or sell to the trust estate in his own name, the highest degree of care and skill required of the trustee by the law in any case should be the standard. And that where a trust company holds itself out and advertises to the world that it has and possesses a higher degree of skill and ability than that possessed by an ordinary man, it should be held to that degree of skill and ability whether or not it actually possesses such skill and ability.

On the question of good faith in the administration of a trust granting such extensive and delicate power to the trustee, the duty the trustee owes to the trust placed in his charge is the duty of finest loyalty. That, as said in Meinhard v. Salmon, 249 N. Y. 458, 62 A. L. R. 1:

"Many forms of conduct permissible in a workaday world for those acting at arm's length are forbidden to those bound by fiduciary ties. A trustee is held to something stricter than the morals of the market place. Not honesty alone, but the punctilio of an honor the most sensitive, is then the standard of behavior. As to this there has developed a tradition that is unbending and inveterate. Uncompromising rigidity has been the attitude of courts of equity when petitioned to undermine the rule of undivided loyalty by the 'disintegrating erosion' of particular exceptions."

The trustee by entering into a trust agreement of this nature, drawn by him, puts himself in a position in which, when dealing as an individual with himself as trustee, thought of self must be renounced, "however hard the abnegation." His duty can be no less than to apply and conform to that ancient and revered rule, "Do unto others as you would have others to do unto you."

Keeping in mind these rules, the conduct of the trustee must be measured by the facts and conditions existing at the time the several investments were made and not in the light of subsequent and unforeseen events. Facts and conditions may afterwards arise such as to render the investment valueless. The trustee is not bound to have and exercise the gift of accurate prophecy. However, ordinary prudence would seem to suggest that a trustee granted such power and privilege should at least look forward as to probable future events in the light of experience based upon past events concerning business transactions and economic conditions, as likely to affect the value of the trust estate. Primarily the preservation of the trust estate is the first consideration, and next is income with which to carry out the object of the trust and distribute benefits to the beneficiaries.

We consider, then, the evidence as to the investments made other than the three above mentioned.

The N. D. Wells loan was made about February, 1930, for $4,000, secured by a first mortgage on the north half of lot 3, block 129, Original Town of Tulsa, with a house some 20 years old. At the time the original loan was made by the Exchange National Company the property was appraised at the value of $10,500. The appraiser noted "outside needed painting." On September 4, 1930, $3,000 of this loan was put in the Finley trust, and participation certificates were issued. At that time balance upon the principal was $3,850. Plaintiff's witnesses appraised the property as of September 5, 1930, at $5,000. Witnesses for the defense valued the property just before the trial at about $5,000, and one witness placed its value at $8,000 as of June, 1932. There was no delinquency of interest or taxes; $1,150.00 had been paid on the principal. From all the evidence it appears that the value of the property at that time was about $6,500, or more than one and one-half times the amount of the unpaid principal of the loan. It is true that after the three $1,000 notes were placed in the Finley trust, taxes were allowed to become delinquent, amounting at the date of the trial to $812, and no payments were made on the principal. Interest had become delinquent to the extent of about $389. But in view of the history of this loan down to the date of the transfer to the Finley trust, there was nothing to indicate that the borrower was likely to cease paying the principal, interest, and taxes.

The finding of the referee as to this loan, to the effect that there was no negligence in transferring this loan to the Finley trust, cannot be said to be against the clear weight of the evidence.

Without going into detail the same may be said of the Wilson loan.

At the trial plaintiff contested the Elmer C. Noble loan, $1,750, the J. W. Burgess loan of $500, and the W. A. Griffith loan of $1,525. but does not in her briefs contest the findings of the referee as to these three loans.

As to the W. C. Brockman loan, for $1,-795, it appears that at the time this loan was purchased for the Finley trust, April 29, 1932, the taxes on the property secured by the mortgage had not been paid for the years 1929. 1930. and 1931, amounting then to about $672. At the date of the trial the taxes delinquent amounted to about $1,431.

In view of the fact that taxes on real property are made a perpetual first lien on the property, and that the property may be sold for the taxes and defeat any mortgage lien, it would seem that any man of ordinary care, caution, and prudence, having money of his own to invest, when about to purchase notes secured by a mortgage on real estate which had then run for a period of three years, would at once inquire whether the mortgagor had kept the taxes paid. It would seem that it would be the imperative duty of a trustee, when about to invest trust funds in such a mortgage, to inquire and ascertain for himself whether the mortgagor had allowed taxes on the property to become delinquent. Failure so to do could hardly be excused on any ground. It does not appear that any inquiry whatever was made in this respect.

The findings of the referee as to this loan cannot be approved. They were clearly against the weight of the evidence in this respect, without regard to the fact that it is said the property was worth several times the amount of the loan.

The Samuel J. Caudill loan was $10,000, made February 4, 1929. $1.000 of which was placed in the Finley trust on March 5, 1931. The loan when made was not well secured. However, the property appears to have been appraised by a Mr. DeVinna at $21,000 when the loan was made. This appraisement was high. No witness valued the property at the time or after the note was placed in the Finley trust at more than $12,000. At the time of the trial this loan had been paid down to $6,000. Evidently the referee gave the trust company the benefit of rather good foresight in this loan. It appears very unlikely that there will ever be any loss on account of this loan. In view of the good showing made by the borrower, we are not inclined to disturb the finding of the referee as to this loan.

It is earnestly contended that the findings of the referee as approved by the trial court, and the judgment based thereon, to the effect that none of the members of the board of directors shown to have participated in the transfer of the Abbott loan, the Collins loan, and the Hackleman loan to the Finley trust, were guilty of bad faith or such negligence with respect thereto as would render them liable for any loss that may grow out of any one or all of the three loans mentioned, are against the clear weight of evidence. The trust company was found guilty of negligence with respect to these three loans, and the evidence abundantly supports the findings.

The findings of fact and conclusions of law upon which the judgment exonerating the directors from liability is based are finding of fact No. XII, and conclusion of law No. X.

Finding of fact No. XII is:

"During the period in which the trust company managed and operated the Finley trust, it managed approximately five hundred (500) other trusts and investment agency accounts. It had a large number of active officers and employees (approximately fifty) to whom was delegated various duties in respect thereto, including accountants, bookkeepers, appraisers, attorneys and executive supervisors of its several departments. The trust department had separate trust officers, including a chief trust officer, assistant trust officer, and investment committee, and other subordinate officers and employees. The real estate loan department negotiated and closed several hundred loans per year (664 in the year 1930). The loans made were put in stock for sale to trust estates managed by the trust company and other investors. The method followed in making trust investments for trusts managed by the trust company was for the officers in charge of the trust department to advise the chief trust officer of the Exchange National Company of the amount of funds available for investment in each of the several trusts. Whereupon the real estate loan department of the trust company or the Exchange National Company would tender for sale to the trusts, securities deemed by them desirable for each trust in the form of written propo-

sals. These written proposals would then be referred to a committee of the board of directors called the investment or loan committee. After the action of this committee they would be submitted for the action of the board of directors. After favorable action by the board of directors, transfers of the securities would be made to the trust purchasing the same. In the case of real estate mortgages, the mortgages would be assigned in writing and the notes endorsed to the trust without recourse. Assignments were generally not recorded with the county clerk. The endorsements were affixed by means of a perforated 'sticker endorsement' easily detachable. The notes, mortgages and assignments were then placed in a separate file and labeled as belonging to the particular trust acquiring such security. To consummate the purchase. a check would be drawn by the Exchange Trust Company upon the bank account designated 'Exchange Trust Company, Trust Funds,' payable to the person from whom the security was acquired and charged to the trust acquiring the security. Each real estate loan acquired by the Finley trust was acquired in this manner. The board of directors held weekly meetings to consider such matters, as above recited, with other matters.

"The directors did not personally inspect the real estate covered by mortgages placed in trust accounts, but relied upon reports, appraisals and other information and recommendations made by active officers, appraisers. employees and committees and placed before them.

"The directors had confidence in the officers, appraisers, employees, and committees and acted in good faith.

"It is not shown that they had knowledge of any ground of suspicion of any inefficiency. dishonesty. lack of integrity or fair and reasonable ability of any officers, appraiser, employees. or committee.

"It is not shown. except in one instance, what individual members of the board of directors were present when considering the matter of placing investments in the Finley trust. Neither of the defendants, sued as directors herein. have been shown by the court to have been guilty of any act of negligence or misconduct in handling of any of the affairs of the Finley trust."

Conclusion of law No. 10 is:

"The negligence or wrongful acts of officers. agents, servants and employees of a corporation are not imputable to the directors of such corporation.

"Before a director can be held liable it must be shown that such director failed to perform some duty devolving upon him as a director. Directors are not guarantors of the efficiency or integrity of employees, nor are they chargeable with knowledge of detailed information as to each separate transaction of such corporation. They are chargeable with general supervision, the fixing of general policies and business methods. and the use of reasonable care in the selection of subordinate officers and employees. They must, in the performance of their duties, use that degree of care and diligence generally used by the ordinarily prudent and careful persons under similar circumstances. They must act in good faith. They have a right to rely upon the integrity, representations and conduct of officers and employees if reasonable care has been used in their selection; and there has not come to their knowledge any just ground of suspicion of lack of care, integrity, or inefficiency. The directors herein sued, did act in good faith and with reasonable care. and are not liable to the plaintiff."

The last sentence in the conclusion of law is in reality a finding of fact.

Conclusion of law No. 10. supra, as a general proposition, may be said to correctly state the rule as to directors of corporations generally, when the question is of liability of the directors to the corporation itself, its stockholders, and general creditors.

Briggs, Receiver, v. Spaulding, 141 U. S. 132, 35 L. Ed. 662, 11 S. Ct. 924.

Therein it is said:

"It is perhaps unnecessary to attempt to define with precision the degree of care and prudence which directors must exercise in the performance of their duties. The degree of care required depends upon the subject to which it is to be applied, and each case has to be determined in view of all the circumstances. They are not insurers of the fidelity of the agents whom they have appointed, who are not their agents. but the agents of the corporation; and they cannot be held responsible for losses resulting from the wrongful acts or omissions of other directors or agents, unless the loss is a consequence of their own neglect of duty, either for failure to supervise the business with attention or in neglecting to use proper care in the appointment of agents."

In Prudential Trust Co. v. McCarter (Mass.) 171 N. E. 42, it is held:

"Directors of bank are bound to exercise ordinary prudence and skill to care for and invest money intrusted in accordance with charter and governing statutes and must be animated by utmost good faith. since they hold themselves out as having superintendence and management of concerns of bank, and thereby engage to conduct its business as men of reasonable ability. necessary intelligence, and sound judgment ought to conduct it."

And:

"Having regard to nature and extent of affairs of bank and customs of banking, directors are justified in committing conduct of its main business to officers and subordinates, and, in absence of grounds for distrust, to assume that such persons will be upright in performance of their duties."

And:

"Directors of bank are entitled to rely upon information and advice given them by executive officers whose probity and competency are not under just suspicion, but directors cannot surrender to such officers responsibilities resting on directors."

It would seem that the minimum duty of a director in this case would be to ascertain the condition of the security offered, especially as to whether the borrower had made payment of interest as it fell due, whether borrower had kept the taxes paid on the mortgaged property, and had kept it insured in cases where this was required of him, and especially whether he was at the time in default as to any part of the principal. We have no hesitancy in saying that no ordinarily prudent investor would invest his own money in securities where the borrower is in default in any of the above particulars.

The directors may be entitled to rely on subordinate officers, employees, etc., for information as to what the facts are with respect to a particular security about to be purchased for a trust estate, but the ultimate question of the safety of such proposed investment is for the directors. If they make the proper investigation in the way of inquiry from their subordinate officers, employees, or other agent whom they have employed and in whom they are entitled to place confidence and trust, and are misinformed as to the facts, they may properly be excused from liability, unless other facts or circumstances are known to them or brought to their attention which would require them in the exercise of ordinary care in the circumstances to reject the security.

In this case it is not shown that the directors were misinformed as to any material existing fact as to the status of the Abbott, Collins, and Hackleman loans. Such directors as were present and participated in the approval of the investments mentioned are therefore presumed to have known the facts relative thereto as found by the referee.

As to the Collins loan, the referee found:

"With reference to the Helen P. Collins loan, the referee finds that this loan was secured by a mortgage on the West Forty (40) feet of the East Eighty-Four (84) feet of lot four (4) in Fourth Oak Grove Addition to the City of Tulsa. On June 19, 1929, Mary M. Quinn, a widow, conveyed this property by warranty deed to Exchange Mortgage and Investment Company for a recited consideration of One Dollar, subject to taxes then due and a mortgage to the Exchange Trust Company for $2,500.00. The Exchange Mortgage and Investment Company was a subsidiary of the Exchange Trust Company whose function was, as stated by the witness Standeven on page 332 of the record as follows:

"'If a loan got in bad or became delinquent or they had to take title to it or something of that kind, they would work it out through the Exchange Mortgage and Investment Company for the purpose of liquidating that loan in the most satisfactory way.'

"On March 1, 1930, the Exchange Mortgage and Investment Company conveyed this property to Helen P. Collins, who executed a first mortgage back to the Exchange National Company for $2,500, and a second mortgage of $1,300. On September 5, 1930, the first mortgage was placed in the Finley trust.

"There appears to have been no appraisement of this property at the time the first and second mortgages were negotiated or at the time the first mortgage was placed in the Finley trust. At least no appraisement was shown in the evidence. Witnesses for the plaintiff were of the opinion that the property was worth, on September 5, 1930, the sum of $2,300. Witnesses for the defendant were of the opinion that the property was worth $2,250, in November 1934; and by deduction from their further testimony as to the manner of arriving at the value, the difference in market and the difference in construction costs between November, 1934, and September 5. 1930, the clear inference is that their opinion of the value as of September 5, 1930, did not exceed $2,700.

"No showing is made as to the financial condition or reputation of the borrower. It is apparent that they paid a high price for the property, entirely on credit, and that no investment of their own therein as incentive to protect it.

"It is apparent from all the evidence concerning this loan that it was originally made for the purpose of liquidating a loan for the same amount that was already in trouble, and that at the time it was placed in the Finley trust it was at least ninety (90%) of the fair value of the property covered by the mortgage securing the same.

The property was not especially well located. This property consists of a four (4) room frame house with no garage on a tract of land forty (40) feet by eighty-four (84) feet, subject to heavy and rather unusual physical and economic depreciation.

"The referee finds that in taking this investment from itself and placing it in the Finley trust, the trustee did not exercise that degree of care, prudence, and integrity that a person of ordinary prudence and enlightened conscience engaged in the same or similar business would have or should have exercised."

As to the Abbott loan, the findings are:

"With reference to the Abbott loan in the sum of $14,000, the referee finds that this loan was originally made by the Exchange Trust Company on June 14, 1927. At that time the property was appraised for the sum of $26,000, the loan was for approximately fifty-four (54%) per cent. of the value thereof. The note was payable in installments as follows:

| | | | |
|---|---|---|---|
| $1,000.00 | due | September | 1, 1928. |
| $1,000.00 | due | September | 1, 1929. |
| $1,000.00 | due | September | 1, 1930. |
| $1,000.00 | due | September | 1, 1931. |
| $10,000.00 | due | September | 1, 1932. |

"The loan was secured by a first mortgage upon a three story brick residence apartment building located at 912 East Sixth Street in the City of Tulsa. At the time the loan was made, the borrower was solvent and had a good reputation for promptness in meeting his obligations.

"On January 31, 1930, being approximately two years and seven months after the loan was made, it was placed in the Finley trust. There was not, at that time, any reappraisement of the property nor is there shown to be any re-examination of the financial condition of the borrower. The borrower had failed to pay the installments due September 1, 1928, and September 1, 1929; and each of these installments, and also the installment due September 1, 1930, and the installment due September 1, 1931, had been extended to become due September 1, 1931, had been extended to become due September 1, 1932.

"Between the date of making this loan and the date it was assigned to the Finley trust, very material changes had taken place in respect to the street on which this property was located. It had become a heavy duty traffic-way to the eastern part of the city and industrial section located beyond this property. This rendered the property unsuitable for residence purposes. The owner sought to overcome this handicap by re-arranging the front of the building, dismantling the two ground floor apartments and converting them into store buildings. After this was done the store rooms had a less rental value than the apartments. The only evidence of these store rooms ever having been rented is that one of them was rented for a short time as an upholstery shop at $10 per month. The witnesses for the plaintiff testified that as of January 31, 1930, the property had a fair value from $10,000 to $12,000. The defendant offered no direct evidence of the value of the property as of January 31, 1930, but did show that they had the property re-examined by their own appraiser on June 7, 1932, and found it to have a fair value of $18,000. The defendant also offered evidence of witnesses that the fair value of this property as of November 15, 1934, was $14,000, and one other witness that it was worth on November 17, 1934, $14,869. They testified that there had been some depreciation in sale value or market value between 1930 and 1934. The maximum depreciation stated on that account was forty (40%) per cent., but each stated that in fixing the value they did not take into account the full market depreciation because they regarded it as an unfair way at arriving at present value. It is evident therefore that their appraisement was somewhat above the market or sale value. After considering the evidence of all these witnesses and factors entering into their judgments and opinions, the referee finds that a fair value as of January 31, 1930, did not exceed $18,000. The testimony of all the witnesses was that the property was generally vacant. Its present rental value is about $80 per month. Witnesses for the defendant testified that its normal rental value, meaning by that after we are out of this present economic depression, or before we entered it, would be about $140 per month. This was his forecast over a period of ten years assuming normal business and economic conditions. Assuming this testimony of the defendant to be sound the property would have, as an investment value according to all the witnesses, of about $14,000 in normal times or such as 1930.

"The referee finds that in placing this loan in the Finley trust on January 31, 1930, it did not use the care, prudence, foresight and informed judgment that persons of ordinary care and reasonable ability, engaged in the same character of business, would have or should have used. We are constrained to believe and find that if this investment had been offered to the trustee by an 'independent third party' it would not have, or at least should not have, purchased the same."

As to the Hackleman loan, the finding is in part:

"With reference to the Hackleman loan, the referee finds that this loan in the sum of $1,000, was made by the Exchange Trust Company on January 11, 1926, due January 11, 1929, secured by a first real estate mortgage on a small frame residence on East Third Street in the City of Tulsa. At the

time the loan was made, the property was appraised at $2,500. On December 27, 1928, the entire loan was extended by agreement with the borrower to become due January 1, 1932.

"On August 22, 1930, being four years and eight months after the loan was negotiated, it was assigned to the Finley trust. It is not shown that there was any re-appraisement or re-examination of the property on the last named date, or any examination as to the financial condition and reputation of the borrower.

"If such inquiries and examinations had been made, with reasonable diligence, it would have thereby been disclosed that the property was considerably depreciated for lack of repair and proper maintenance. That the borrower and owner of the property was dead. That the taxes on said property were approximately eight months past due and delinquent. That the title of the property had passed by descent to fourteen heirs of the borrower, four of whom were minor grandchildren. The interest of these heirs ranged from one-third in the widow to one forty-eighth in the minor grandchildren. * * *

"After considering these factors and the evidence of all the witnesses, the referee finds that this property as of August 22, 1930, did not have a fair value exceeding $1,600, and that by use of ordinary care the trustee could have learned this fact and that the borrower was dead, and that the taxes on the property were long past due, and that the title to the property was held by ten cotenants, four of whom were minor children. The referee believes and finds as a fact that if a loan in this situation and upon property of this value had been tendered to the trustee for trust investment by an 'independent third party' it would not have and should not have, in exercise of ordinary care, purchased the same."

It appears clear that as to the Collins loan and the Hackleman loan, the directors who approved same as an investment for the Finley trust wholly failed to use that degree of care, diligence, and prudence required of them. The finding of fact, conclusions of law, and judgment exonerating them are therefore clearly against the weight of the evidence and cannot be approved.

As to the Abbott loan, we are not prepared to say that the findings of fact, conclusions of law, and judgment are clearly against the weight of the evidence. It is true that the borrower had not paid the first two notes as they became due, but he was not in default. Time of payment had been duly and regularly extended, and the directors were entitled to reply upon the good faith and judgment of its other officers in extending the time. Otherwise the loan was in good standing. Unfortunately, thereafter the borrower made default in payment of principal, interest, and taxes. But, as we view the law, the directors are chargeable with negligence only as and of the time when the loan was placed in the Finley trust.

Except as herein indicated, the judgment of the trial court is affirmed.

The judgment in favor of the participating directors as to the Collins and Hackleman loans is reversed. The judgment in favor of both the trust company and the directors participating in the approval of the Brockman loan is reversed.

The cause is remanded, with directions to enter judgment in accordance with the views herein expressed.

BAYLESS, V. C. J., and WELCH, PHELPS, CORN, HURST, and DAVISON, JJ., concur. GIBSON, J., not participating. OSBORN, C. J., absent.