Dear Executive Director, Privett
¶ 0 The Attorney General has received your letter asking for an official opinion addressing, in effect, the following question:
May the Oklahoma Public Employees Retirement System writeexchange-traded call options on equity securities, debtsecurities and indexes?
 I.
¶ 1 Options contracts have historically been private transactions in which individual parties negotiated specific terms of agreement. See J. Walmsley, The New FinancialInstruments (1988); Johnson, "Is It Better to Go Naked on the Street? A Primer on the Options Market," 55 Notre Dame Law. 7 (1979). See, also, Deutschman v. Beneficial Corp., 841 F.2d 502
(3rd Cir. 1988). The utility of these contracts was limited, however, by their high transaction costs and the absence of a secondary trading market. Walmsley, supra, at 149.
¶ 2 In an effort to avoid these perceived disadvantages, the Chicago Board Options Exchange developed standardized options contracts. Walmsley, supra, at 149. The Chicago Board initiated trading in standardized options in 1973. Id. Later, other exchanges began listing options, including the New York Stock Exchange, the American Stock Exchange, the Philadelphia Stock Exchange and the Pacific Stock Exchange. Seligman, The Structureof the Options Markets, 10 J. Corp. Law 141 (1984). Seegenerally Report of the Special Study of the Options Market tothe Securities and Exchange Commission, House Comm. Print 96-IFC3, 96th Cong., 1st Sess. (1978).
¶ 3 Standardized options create relatively straightforward contractual relationships. The party who sells the option — also called the "writer" — grants the buyer of the option the right to buy from, or sell to, the seller an underlying interest at a fixed or determinable price within a specified period of time. See Options Clearing Corp., Characteristics and Risks ofStandardized Options, 4 (1987) (hereinafter Characteristics); Walmsley, supra, at 154-5; Johnson, supra, at 7-8. In exchange for this right, the buyer pays a cash "premium" payment to the writer. Characteristics, at 6; Seligman, supra, at 144.
¶ 4 When the writer grants to the buyer the right to purchase the designated interest, the option is a "call" option; when the buyer gains the right to sell the underlying interest to the writer, the option is a "put" option. Characteristics, at 4; Johnson, supra, at 8. The price at which the interest may be bought or sold is the "exercise" or "strike" price.Characteristics, at 5; Seligman, supra, at 145. The date after which the option is void is the "expiration date."Characteristics, at 6.
¶ 5 Once an option is exercised, the transaction is settled by the writer's delivery or acceptance of the underlying interest or a cash payment to the buyer. Characteristics, at 28-31. However, to avoid the higher transaction costs associated with the settlement procedure, option participants often purchase off-setting option positions to cancel out their obligations prior to the occurrence of an exercise. Characteristics, at 7; Walmsley, supra, at 155-56.
¶ 6 The interest underlying an option may be virtually any financial instrument. The first options were based on equity interests, such as stocks. Sec. Exch. Act Release No. 9985 (Feb. 1, 1973); Seligman, supra, at 144. Following the introduction of stock options, options on U.S. Treasury debt securities became available. Sec. Exch. Act Releases Nos. 19126-19130 and 19132 (Oct. 14, 1982); Seligman, supra, at 151. The options currently listed range from ordinary stock and interest rate options to options on foreign currencies and futures contracts. Options Clearing Corp., Directory of Exchange Listed Options (April 1991).
¶ 7 Options based on indexes are also available. An index is not a specific instrument, of course; an index is a measure of the value of a set of stocks or other instruments. Consequently, index options are based not on one tangible instrument, but on the theoretical value of the interests that comprise the index.Characteristics, at 32; Seligman, supra, at 147. So because a writer cannot deliver a specific underlying interest in index options transactions, these contracts are settled through cash payments based on the index calculation Characteristics, at 34, 42; Walmsley, supra, at 182.
¶ 8 All standardized options traded on the exchanges are issued by the Options Clearing Corporation ("OCC"). Characteristics,
at 70; Seligman, supra, at 145. The OCC is a self-regulating organization operating under the jurisdiction of the Securities Exchange Commission. Characteristics, at 70. It is jointly owned by the exchanges that list option contracts. Id.; see,also, Prospectus of the Options Clearing Corp., (April 30, 1991). The OCC issues options by virtue of the interplay of contractual relations between the OCC, its clearing members — usually securities firms — and the customers of clearing members. Seligman, supra, at 145-46.[1]
¶ 9 To assure performance of options transactions, the OCC obligates option writers, through their clearing members, to maintain "margin" with respect to each option position.Characteristics, at 14; OCC Prospectus, at 8. Thus, writers are required to either deposit the underlying interest or maintain an appropriate level of cash or other collateral.
¶ 10 In the case of index options, a slightly different procedure is available to insure that writers deposit sufficient margin to guarantee completion of a transaction. Because it is often too cumbersome for an individual writer to maintain an inventory of each of the securities included in an index, the Securities Exchange Commission has approved the use of escrow receipts to substitute for the deposit of the specific index interests. Sec. Exch. Act Release No. 34-22323 (Aug. 13, 1985). The escrow receipts essentially serve to verify that options are written against a diversified portfolio of securities. Id.
¶ 11 Apart from the market for standardized options, a significant over-the-counter market currently exists for non-standard financial options. Because of changes in technology and the size and financial sophistication of institutional investors, more transactions are now privately negotiated to suit the specific needs of individual participants. See Raghavan,Wall Street Moves in on Futures Products, Wall St. J., Feb. 4, 1992, at C1, col. 3. In some sense, this growing segment of the market represents a return to the historical origin of options transactions.
 II.
¶ 12 Your inquiry is whether the Oklahoma Public Employees Retirement System ("System") may write exchange-traded call options on equity securities, debt securities and indexes.
¶ 13 The investment activities of the System are governed by74 O.S. 909.1 (1991) (as amended by 5 of S.B. 505 of the 2nd Regular Session of the 43rd Oklahoma Legislature). 74 O.S.909.1 directs the Board of Trustees of the System to retain qualified investment managers to invest the System's monies. In addition, the statute requires the trustees to diversify the investments of the System so as to minimize the risk of large losses. Id. It also authorizes the trustees to establish an investment committee to advise the trustees concerning the selection of investment managers and to make recommendations concerning investment guidelines and policy. Id. In sum, 74O.S. 909.1 grants the trustees a general authority to invest the monies of the System.[2]
¶ 14 Traditionally, "investing" is the conversion of an asset into some other form of wealth, usually of a more or less permanent nature; the employment of capital for some profitable use; or the placing of money so that it will be safe and yield a profit. Popp v. Munger, 268 P. 1100 (Okla. 1928). The practice of option writing, however, does not easily comport with the traditional notion of what "investing" is. When the System sells or writes an option, it is not clear that the System invests in anything; rather, it appears that the System undertakes a contractual obligation for which it receives cash compensation.
¶ 15 Nevertheless, it is manifest that option writing transactions are, in at least some sense, investment activities. When a writer sells an option, the writer becomes obligated to deliver the underlying interest if the option is exercised. To assure performance of the transac tion, the writer deposits margin. That is, the writer places pledged assets at risk. The writer engages in this transaction with the expec tation of earning a profit from the premium payment. These activities, the assumption of risk and the expectation of reward, are at the very heart of the concept of investing. See K. Ambachtsheer J. Ambrose, "Basic Financial Concepts: Return and Risk," inManaging Investment Portfolios (1983).
¶ 16 Because option writing would place the assets of the System at risk, and because the System would enter into such transaction with the expectation of earning a return, we equate selling options with any other type of investment activity. Therefore, we conclude that the general investment authority granted to the System by 74 O.S. 1991, 909.1 (as amended by 5 of S.B. 505 of the 2nd Regular Session of the 43rd Oklahoma Legislature) empowers the System to write exchange-traded call options. Also, because the System's authority to invest is a general one, we find no reason to differentiate between writing options based on equity securities, debt securities or indexes.
 III.
¶ 17 While we have determined that the System is authorized to enter into investment transactions to write call options, our inquiry is not yet complete. To provide a thorough analysis, we must further address the obligations of the Board of Trustees of the System to discharge their duties in a proper manner.
A. The Duty of Care, Skill, Prudence and Diligence.
¶ 18 The general rule has long been that public officials are accorded immunity from suit so long as they are acting in good faith and not willfully or maliciously. See Neal v. Donahue,611 P.2d 1125 (Okla. 1980); Dickey v. Cordell, 55 P.2d 126
(Okla. 1936). But in this instance, to ensure that the monies of the System are invested in a prudent and secure manner, the Legislature has imposed a more stringent duty on the trustees who are responsible for the operation of the System.
¶ 19 74 O.S. 909.1(A) (as amended by 5 of S.B. 505 of the 2nd Regular Session of the 43rd Oklahoma Legislature) provides, in pertinent part, as follows:
 The Oklahoma Public Employees Retirement System Board of Trustees shall discharge their duties with respect to the System . . . with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims[.]
¶ 20 This standard applies, of course, to the investment decisions made by the trustees. Therefore, if the Board of Trustees of the System elects to engage in option writing transactions, its decision will be subject to review for compliance with the duty of care imposed by 74 O.S. 909.1.
¶ 21 We are aware of no reported Oklahoma cases that analyze the duty imposed under 74 O.S. 909.1. However, because 74 O.S.909.1 essentially serves to codify the "prudent man" rule of the common law of trusts, we find the Oklahoma cases addressing the fiduciary duty of trustees to be relevant. Furthermore, because the standard set forth in that provision is virtually identical to the fiduciary duty imposed under the Employee Retirement Income Security Act ("ERISA"), see 29 U.S.C.A. 1104(1) (1992), and because these statutory duties appear to have been imposed for similar policy reasons, we find the federal cases construing the corresponding ERISA provision to be instructive with respect to the proper interpretation of 74 O.S. 909.1.
¶ 22 At a minimum, the duty of care, skill, prudence and diligence requires a trustee to employ appropriate methods to investigate the merits of an investment. Katsaros v. Cody,568 F.Supp. 360 (E.D.N.Y. 1983), aff'd 744 F.2d 270 (2nd Cir. 1984), cert. denied sub nom. Cody v. Donovan, 469 U.S. 1072,105 S.Ct. 565, 83 L.Ed.2d 506 (1984); Fink v. National Savingsand Trust Co., 772 F.2d 951 (D.C. Cir. 1985). It requires a trustee who is unfamiliar with an unusual or difficult investment decision to make an independent inquiry into the particular investment rather than relying wholly upon the advice of others.Donovan v. Mazzola, 716 F.2d 1226 (9th Cir. 1983); Katsaros,568 F.Supp. at 367. A trustee who lacks the education, experience and skill required to make a decision regarding a particular investment has an affirmative duty to seek independent counsel in making the decision; failure to do so is imprudent and constitutes a violation of the trustee's fiduciary duty. SeeDonovan v. Walton, 609 F.Supp. 1221 (D.Fla. 1985); Whitfield v.Cohen, 682 F.Supp. 188 (S.D.N.Y. 1988).
¶ 23 The prudence of an investment decision is measured by the objective "prudent man" standard of the common law of trusts.Donovan v. Mazzola, 716 F.2d at 1231; Katsaros,744 F.2d at 279. See, also, In re Flynn's Estate, 237 P.2d 903 (Okla. 1951). So in the event a trustee commits the assets of a plan to an investment he does not fully understand, he will nonetheless be judged according to the objective prudent person standard.Marshall v. Glass/Metal Ass'n and Glaziers and GlassworkersPension Plan, 507 F.Supp. 378 (D.Haw. 1980). The subjective sincerity of the belief of a trustee as to the propriety of a particular investment is "essentially irrelevant" to the determination of whether the conduct was objectively prudent.Marshall, 507 F.Supp. at 382. Indeed, a trustee may be held liable for a loss resulting from his failure to use the care and skill of a prudent person, even though he may have exercised all of the care and skill of which he was capable. Finley v.Exchange Trust Co., 80 P.2d 296 (Okla. 1938).
B. Application of the Duty of Care, Skill, Prudence andDiligence to Option Writing Transactions.
¶ 24 The application of the 74 O.S. 909.1 duty of care, skill, prudence and diligence to option writing transactions requires the Board of Trustees of the System to take a number of steps. First, the trustees must employ appropriate methods to investigate the merits of option writing transactions to determine whether the particular transactions are prudent. If the trustees are unfamiliar with option writing transactions, then they must make an independent inquiry into the matter. In making this inquiry, the trustees cannot rely wholly upon the advice of others — particularly the proponent of the transactions. If the trustees lack the education, experience and skill necessary to make a decision regarding option writing transactions, the trustees are obliged to act affirmatively to seek independent counsel in making the decision. Where the trustees fail to take these steps, they may be subject to liability for any losses caused by violation of their fiduciary duty.
¶ 25 With regard to the prudence of option transactions as a class, such transactions have often been characterized as speculative and, therefore, imprudent. See Haskell, "The Prudent Person Rule for Trustee Investment and Modern Portfolio Theory," 69 N.C.L. Rev. 87, 90 (1990). Many authorities, however, reject the view that investment transactions may be deemed to be per se imprudent. See, e.g., Chase v. Pevear, 419 N.E.2d 1358 (Mass. 1981). See also Restatement (Third) of Trusts 227 (1992); Note, "The Regulation of Risky Investments," 83 Harv. L. Rev. 603 (1970). Indeed, a number of authorities suggest that, in some instances, certain types of option transactions may be consistent with the duty of prudence. Johnson, supra, at 21; Restatement, 227, comments f and k. Accord Lynch v. J.P. Stevens Co.,Inc., 758 F.Supp. 976 (D.N.J. 1991) (treating investments in futures and options as not imprudent per se).
¶ 26 In any event, under the existing law of Oklahoma, the question of whether investment decisions comply with the fiduciary duty of care, skill, prudence and diligence is a question of fact which must be determined with reference to the facts and circumstances of each case. See Finley,80 P.2d at 298, syl. 7. Accordingly, we cannot conclude, as a matter of law, that the decision to engage in options transactions either will or will not be prudent in all circumstances.
C. Consideration of the System's Market Position in Applying theDuty of Care, Skill, Prudence and Diligence to Option WritingTransactions.
¶ 27 In the course of investigating the merits of contemplated option writing transactions to determine their prudence, the Board of Trustees is obliged to analyze the potential risks and rewards of the transactions. In making this analysis, the trustees should recognize that the risk entailed by writing options is, in part, dependent on the market position of the writer.
¶ 28 Standardized options require that the writer deliver the interest in the event the option is exercised — not that the writer own the underlying interest at the time the option is executed. A writer who owns the underlying interest writes a "covered" call; a writer who does not own the underlying security writes an "uncovered" or "naked" call. Characteristics, at 7-8; Johnson, supra, at 8. This distinction, based on the market position of the individual party, represents a considerable difference in the risk assumed by each writer.
¶ 29 The writer of a covered call forgoes the opportunity to benefit from an increase in the market price of the underlying interest above the option price. Characteristics, at 19. That is, once the price of the security rises above the strike price, the option may be exercised and the benefit of any subsequent appreciation of the security will accrue to the buyer. In addition, the writer continues to bear the risk of a decline in the value of the underlying security. Id. But in the event there is a decline in the value of the underlying security, the writer of a covered call has effectively reduced his unrealized loss by the amount of the premium. Walmsley, supra, at 168-71.
¶ 30 The writer of an uncovered call, on the other hand, is in a much more risky position. The uncovered call writer will be responsible for any rise in the market price of the underlying interest, less the amount of the premium. Characteristics, at 19-20; Walmsley, supra, at 171-72. So if the value of the underlying interest increases above the exercise price, the writer will incur a loss. And because there is no cap on the rise of the market for any particular security, the potential loss to the writer is virtually unlimited. Characteristics. at 20.
¶ 31 The writer of index options faces additional risk arising from the difficulty of maintaining cover. The danger is that an increase in the prices of the securities of the index will exceed any increase in the prices of the securities held in the portfolio against which the option is written. Characteristics,
at 7-8, 36. Thus, exposure to market risk depends upon the extent to which the securities held in the writer's portfolio coincide with the securities that comprise the index.
¶ 32 Because the market position of the writer affects the risk entailed in various option writing transactions, it is essential that the trustees understand this factor and know the level of risk associated with the particular transactions or types of transactions that they authorize. Therefore, in investigating the merits of contemplated option writing transactions to determine whether the transactions are prudent, the Board of Trustees of the Oklahoma Public Employees Retirement System has the additional duty of ascertaining the market position of the System and considering the impact of this factor on the risk of the transactions.
D. Consideration of Overall Portfolio Objectives in Applying theDuty of Care, Skill, Prudence and Diligence to Option WritingTransactions.
¶ 33 The application of the 74 O.S. 909.1 fiduciary duty to investment decisions also raises the question of whether each investment must be evaluated for compliance with the fiduciary duty on an individual basis, or whether the objectives of the portfolio as a whole may also be considered.
¶ 34 The law of Oklahoma is for the most part silent on this issue. The only directly relevant authority is a 1971 opinion of the Attorney General, A.G. Opin. No. 71-303. There, the Attorney General considered the "prudent man" rule which governed investments by the Teachers' Retirement System. See 70 O.S.17-107 (1970). In the opinion, the Attorney General simply indicated that when making investments in shares of various mutual funds, the Teachers' Retirement System should consider each investment individually. A.G. Opin. No. 71-303 at 311.
¶ 35 But since the issuance of that opinion, the courts of other states have given more comprehensive consideration to the question. In one leading case, In the Matter of Bank of NewYork, 35 N.Y.2d 512, 323 N.E.2d 700, 703 (1974), the Court of Appeals of New York reasoned as follow:
 The record of any individual investment is not to be viewed exclusively, of course, as though it were in its own water-tight compartment, since to some extent individual investment decisions may properly be affected by considerations of the performance of the fund as an entity, as in the instance, for example, of individual security decisions based in part on considerations of diversification of the fund or of capital transactions to achieve sound tax planning for the fund as a whole. The focus of inquiry, however, is nonetheless on the individual security as such and factors relating to the entire portfolio are to be weighed only along with others in reviewing the prudence of the particular investment decisions.
¶ 36 Thus, in Bank of New York, the court maintained the focus of inquiry on the specific investments made by the trustees, but allowed the trustees to consider overall portfolio objectives as a factor in making individual investment decisions.Accord Withers v. Teachers' Retirement System of the City of NewYork, 447 F.Supp. 1248 (S.D.N.Y. 1978); Restatement (Third) of Trusts 227(a) (1992); 3 A. Scott W. Fratcher, The Law ofTrusts, 227.12 (4th Ed. 1988). See, also, J. Vawter, "Determination of Portfolio Policies: Institutional Investors," in Managing Investment Portfolios (1983). We are persuaded by the logic of this approach. Furthermore, we find this view to be consistent with the diversification requirement and the "total return objective" set forth by the Legislature in 74 O.S.909.1(A)(3) and 74 O.S. 909.1(A)(D) (1991) (as amended by 5 of S.B. 505 of the 2nd Regular Session of the 43rd Oklahoma Legislature).
¶ 37 Accordingly, we conclude that in applying the fiduciary duty imposed by 74 O.S. 909.1 (1991) (as amended by 5 of S.B. 505 of the 2nd Regular Session of the 43rd Oklahoma Legislature) to the investment decisions of the System, the primary focus of consideration should be on the particular investment decision; nevertheless, the Board of Trustees may take into consideration the overall objectives of the System's portfolio as a whole.
 IV. ¶ 38 It is, therefore, the official opinion of the AttorneyGeneral that:
 1. The general investment authority granted to the OklahomaPublic Employees Retirement System by 74 O.S. 909.1 (1991)(as amended by 5 of S.B. 505 of the 2nd Regular Session of the43rd Oklahoma Legislature) empowers the System to writeexchange-traded options.
 2. (a) Any decision by the Board of Trustees of the OklahomaPublic Employees Retirement System to engage in options writingtransactions will be subject to review for compliance with thefiduciary duty of care, skill, prudence and diligence imposed onthe trustees by 74 O.S. 909.1 (1991) (as amended by 5 of S.B.505 of the 2nd Regular Session of the 43rd OklahomaLegislature).
 (b) The application of the 74 O.S. 909.1 (1991) (asamended by 5 of S.B. 505 of the 2nd Regular Session of the 43rdOklahoma Legislature) duty of care, skill, prudence and diligenceto option writing transactions requires the Board of Trustees ofthe System to take a number of steps. First, the trustees mustemploy appropriate methods to investigate the merits of optionwriting transactions to determine whether the particulartransactions are prudent. If the trustees are unfamiliar withoption writing transactions, then they must make an independentinquiry into the matter. In making this inquiry, the trusteescannot rely wholly upon the advice of others — particularly theproponent of the transactions. If the trustees lack theeducation, experience and skill necessary to make a decisionregarding option writing transactions, the trustees are obligedto act affirmatively to seek independent counsel in making thedecision. Where the trustees fail to take these steps, they maybe subject to liability for any losses caused by violation oftheir fiduciary duty. Whether particular investment decisionscomply with the fiduciary duty of care, skill, prudence anddiligence imposed by 74 O.S. 909.1 (1991) (as amended by 5 ofS.B. 505 of the 2nd Regular Session of the 43rd OklahomaLegislature) is a question of fact.
 (c) In investigating the meritq of contemplated option writingtransactions to determine whether the transactions are prudent,the Board of Trustees of the Oklahoma Public Employees RetirementSystem haq the additional duty of ascertaining the marketposition of the System and considering the impact of this factoron the risk of the transactions.
 (d) In applying the fiduciary duty imposed by 74 O.S. 909.1(1991) (as amended by 5 of S.B. 505 of the 2nd Regular Sessionof the 43rd Oklahoma Legislature), the primary focus ofconsideration should be on the particular investment decision;nevertheless, the Board of Trustees may take into considerationthe overall objectiveq of the System's portfolio aq a whole.
SUSAN BRIMER LOVING ATTORNEY GENERAL OF OKLAHOMA
K.W. JOHNSTON ASSISTANT ATTORNEY GENERAL
[1] To illustrate a typical transaction, assume that an investor decides to undertake the obligation to write an option. After the writer and a buyer reach an agreement on the floor of an exchange, the order to effect the transaction is placed through a clearing member. Based upon its relationship with the clearing member, the OCC issues an option to the buyer and transfers the premium payment to the writer. The obligation to complete the transaction, in the event the option is exercised, is assigned by the OCC to a clearing member. The clearing member, in turn, looks to the original writer to honor the agreement. In this manner, the OCC stands between the buyer and the seller in each option transaction.
[2] The investment activities of other state pension systems are also governed by similar statutes. See §§ 1-4 of S.B 505 of the 2nd Regular Session of the 43rd Oklahoma Legislature amending, respectively, 11 O.S. 1991, § 49-100.9[11-49-100.9] (Oklahoma Firefighters Pension and Retirement System); 11 O.S. 1991, §50-105.4[11-50-105.4] (Oklahoma Police Pension and Retirement System); 47O.S. 1991, § 2-303.1[47-2-303.1] (Oklahoma Law Enforcement Retirement System); 70 O.S. 1991, § 17-106.1[70-17-106.1] (Teachers' Retirement System of Oklahoma).