**Ray MARSHALL, Secretary of the United States Department of Labor, Plaintiff,**

v.

**TEAMSTERS LOCAL 282 PENSION TRUST FUND, John Cody, Louis Nappi, William Argento, John Dee, Robert Sasso, Joseph Fater, Salvatore Picone, and Herbert Schneider, Defendants.**

**No. 78 C 543.**

United States District Court, E. D. New York.

Aug. 11, 1978.

David G. Trager, U. S. Atty., Eastern District of New York, Brooklyn, N. Y., Robert N. Eccles and Samuel W. Halpern, U. S. Dept. of Labor, Washington, D. C., for plaintiff Plan Benefits Security Division.

O'Connor, Quinlan & Mangan, P. C., New York City, for defendants; J. Kenneth O'Connor, New York City, of counsel.

Memorandum of Decision and Order

MISHLER, Chief Judge.

This action is brought by the Secretary of the United States Department of Labor ("Secretary"), pursuant to the authority granted under Section 502(a)(5) of the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. § 1132(a)(5), to enjoin the trustees of Teamster's Local 282 Pension Trust Fund ("Plan") from loaning one Hyman Green (Green), $20 million under a construction-permanent mortgage agreement, to finance a 1,000 plus room hotel and gambling casino on the "Strip" in Las Vegas, Nevada. The complaint alleges that the agreement with Green provides for the conveyance of 1640 acres of land on Long Island, owned by the Plan, at a price of approximately $15 million dollars, by Green executing a purchase money mortgage to the Plan, for the full amount of the purchase price. The complaint alleges a violation of Section 404(a)(1)(B)–(C) of ERISA, 29 U.S.C. § 1104(a)(1)(B)–(C).[1]

---

1. Section 404(a)(1)(B)–(C) provides in pertinent part:

 (a)(1) . . . a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and—

 · · · · ·

 (B) with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims; ·

Defendants' answer generally denies those allegations of the complaint alleging violations of Section 404(a)(1)(B)–(C), of ERISA.

The case was tried to the court without a jury. The court finds:

The Fund was established approximately twenty-five (25) years ago for the benefit of members of Local 282 who are employed by truckers of materials in the building trade. Since 1971 the years have witnessed a declining rate of activity in the trucking industry affiliated with the building trades. As a consequence, the number of members employed, and the number of hours of employment of employed members, decreased. Since the contributions to the Plan made by the employers were based on hours employed at regular time, the total amount contributed to the Plan decreased significantly, from the year ending 1971, to the year ending 1976. In 1971, 4,462 members were employed, for an average of 1,827 hours; in 1976, 3,352 members were employed, for an average of 1,432 hours. While the basis of the contributions to the Plan decreased, the number of pensioners receiving benefits increased. As of February 28, 1977, 1,966 pensioners were receiving benefits. The ratio of pensioners to active employees was 1 to 1.7.

Employer contributions actually received by the Fund for the year ending February 28, 1977, amounted to $6,539,000. After expenses for payroll audits, collection fees, administration expenses, and retirement counselling fees, the sum available for benefits was $6,183,700 (Ex. 8, pp. 7 & 22). Benefits paid pensioners, for the fiscal year ending 1977, was approximately $6,400,000 (Ex. 8, p. 39).

The Fund's assets, as of February 28, 1977, were $55,293,339.13 (Ex. 8, p. 33). The assets included 1640 acres of land in Southampton which is the subject of this litigation valued at $8,130,321.95.[2]

The actuarial cost to the Plan, for fiscal year 1977, was $10,756,500; the actuarial cost exceeded gross contributions by $4,217,500. The liability of the Fund for the current pensioners and beneficiaries is $78,208,800 (Ex. 8, p. 14). The total liability of the Fund for all vested benefits (including the liability to current pensioners and beneficiaries) is $143,000,000.

When the trustees became aware of the financial condition of the Plan through the contents of the actuarial report[3] which indicated that the soundness of the Plan was threatened, their attention turned to corrective measures. Reduction of benefits was discussed.[4] The labor contract expired June 30, 1978. A three year labor contract currently under negotiation would increase employer contributions to the Plan from approximately $1.85 per hour of regular time to approximately $3.36 per hour of total time (including overtime).[5]

The trustees saw some relief from financial problems when on October 28, 1977, Green and his attorney appeared before a meeting of the trustees. Green advised the trustees that he held an option to purchase

(C) by diversifying the investments of the plan so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so;

.2. The land was purchased by the Fund in two parcels: one in 1970 and one in 1974, for $6,000,000. The valuation reflects the cost to the Fund to February 28, 1977.

3. The report for fiscal year March 1, 1976, to February 28, 1977, was transmitted to the trustees by letter dated March 31, 1978. It is apparent that the trustees were aware that the Plan had serious financial problems before receipt of the report.

4. For example: the Plan provides for early retirement benefits of $400 per month, after twenty (20) years of employment, even if only ten (10) years were covered employment in which employers contributed to the Plan (Nappi, Tr. p. 70a).

5. At the time of this writing it appears that negotiations have not resulted in a renewed labor agreement and that the union has called a strike.

approximately ten (10) acres of vacant land on the "Strip" in Las Vegas, Nevada, for the sum of $5,850,000. He applied to the trustees for a 20 year $20,000,000 permanent first mortgage bearing interest at the rate of 9% per annum on a hotel consisting of 1,000 plus rooms and a gambling casino to be erected on the site. Green suggested that the commitment provide for an initial advance of $3,500,000, to provide the funds to acquire title to the land; and the balance of $16,500,000 to be advanced when the certificate of occupancy for the hotel would be issued (estimated to be early spring of 1979). Green agreed to enter into a contract for the purchase of the Southampton property at the time of the initial advance of $3,500,000. The price was to be based on the cost of the land to the Plan, in addition to 8% per year of the monies invested by the Plan from the date said monies were invested to the date of payment of the final advance on the loan. It was estimated that the purchase price would be approximately $13,500,000, (the closing estimated to be on or about April 1, 1979) and that the entire purchase price was to be paid by a 20 year purchase money mortgage with interest at the rate of 9% per annum. Green also offered to secure payment of the purchase price of the Southampton property by increasing the first mortgage lien on the Nevada property in the amount determined to be the purchase price of the Southampton property.

The trustees saw the opportunity to convert an asset that had burdened the estate to an income producing asset and at the same time increase the book value of its assets. They unanimously authorized the issuance of the commitment ". . . subject to applicants having first complied with all of the criteria of the Trust. . . ." [6] The commitment, in substantial compliance with the terms outlined by Green at the October 28, 1977 meeting and including the sale of the Southampton property, was issued at a meeting of the trustees of the Plan on January 17, 1978. Some time between that meeting, and a meeting of the trustees on February 22, 1978, Green learned that the bank from which he intended to borrow $20 million under a construction loan, declined to make such loan.[7] At the February 22, 1978 meeting, the commitment was amended to provide for a two year construction loan of $20 million at 11½% per annum, which, upon completion of the improvements, was to be converted to a permanent loan in the same amount with interest at 9¾% per annum for twenty (20) years, with an option on the part of the Plan to reduce the term to ten (10) years on notice prior to the ninth anniversary date of the permanent mortgage. The Plan had the right to sell the Southampton property any time prior to the closing of title, i. e., the date of the execution of the permanent mortgage. The mortgage on the Southampton property, now estimated to be in the principal amount of $15 million, was to bear interest at the rate of 8¼% per annum. As in the original commitment, Green's interest in the hotel and gambling casino was to secure payment of the purchase money mortgage on the Southampton property, in addition to the $20 million permanent mortgage loan on that property.

## DISCUSSION

The question presented in this litigation is whether the investment of $20 million of the Plan's assets is a disproportionate share of the total asset, so that it violates the

---

**6.** One of the trustees, Louis Nappi, testified (Tr. p. 93a):

> The Court: From what you said Mr. Nappi, what is attractive in this deal is the fact that you take the 1,600 acres of land out in Southampton and put it in an income producing asset?
> The Witness: Yes, sir.
> The Court: Without that, the deal is not attractive?
> The Witness: That is correct. We were very much concerned, your honor, that to change Southampton into an income producing property, and in order to put a package together, we included Southampton as a requirement for the deal.

**7.** The testimony indicates that the bank was concerned about problems in dealing with a pension plan and the possibility that funds, which the bank would expect from a permanent mortgage to satisfy their construction loan, would not be available.

diversification limitation of ERISA; and/or whether making such a loan, dependent on the success of the gambling casino, is imprudent under the circumstances.

 The legislative history of the pertinent sections of ERISA indicates, that to the extent practical, the obligations of trustees of pension funds and the limitations on their power of investment were to be interpreted under principles applicable to trustees under the common law of trusts, with a view toward establishing uniform standards.[8] There is lack of uniformity in the application of the rule imposing the obligation on the trustee to diversify, as it relates to prudent investment. In some jurisdictions, lack of diversification is a per se breach of the trustees' investment duty of prudence; in others it is not. 3 Scott on Trusts § 228 (3rd Ed. 1967); Trust Fund Investments in New York: The Prudent Man Rule and Diversification of Investments, 47 N.Y.U. Law Review 527 (1972). Section 404(a)(1)(c) requires diversification under circumstances where commitment of a high percentage of the assets of a plan to a particular investment or class of investments casts doubt on the prudence of the investments.

The investment objectives of a private trust, through which investment standards developed under the common law, are not the same as those of a pension plan. "Although Congress thus left the major responsibility for filling in the contours of the fiduciary standards to the courts, the judicial role might nevertheless be limited to adopting and rationalizing the common law of trusts. . . . There is, however, sub-stantial reason to believe that Congress did not intend to compel the courts to rely exclusively on the common law when drawing the contours of ERISA's fiduciary standards. The Conference Committee report explicitly instructs the courts to interpret the prudent man rule 'bearing in mind the special nature and purpose of employee benefit plans' (See S.Conf.Rep.No. 93–1090, supra note 31 at 302)." Fiduciary Standards and the Prudent Man Rule Under the Employment Retirement Income Security Act of 1974, 88 Harv.L.Rev. (Part 2) 960, 966–967 (1975).[9]

Though there is no statutory limitation phrased in percentage, the Conference Committee report notes at p. 304:

A fiduciary usually should not invest the whole or an unduly large proportion of the trust property in a single security. Ordinarily the fiduciary should not invest the whole or an unduly large proportion of the trust property in one type of security or in various types of securities dependent upon the success of one enterprise or upon conditions in one locality, since the effect is to increase the risk of large losses . . . . If he is investing in mortgages on real property, he should not invest a disproportionate amount of the trust in mortgages in a particular district or on a particular class of property so that a decline in property values in that district or of that class might cause large loss.

 A limitation on the power of the trustees to invest is found in percentage terms in the trust agreement. Article V, Section 4(a) provides in pertinent part:

The conference agreement applies the "prudent man" rule to the conduct of fiduciaries. 3 U. S. Code and Administrative News 1974 p. 5186.

8. Senator Harrison A. Williams, Jr., Chairman of the Senate Committee on Labor and Public Welfare, upon introducing the conference report stated:

[T]he legislation imposes strict fiduciary obligations on those who have discretion or responsibility respecting the management, handling, or disposition of pension or welfare plan assets. The objectives of these provisions are to make applicable the law of trusts; . . . to establish uniform fiduciary standards to prevent transactions which dissipate or endanger plan assets, and to provide effective remedies for breaches of trust.

. . . . .

9. The writer points out that in a pension plan the trustees need not be faced with problems arising from tensions between a beneficiary and remainderman in a private trust: the former interested in high income investments, while the latter in preserving the corpus of the trust. The typical private trust receives its capital only at the inception of the trust; while pension plans receive new funds regularly, "freeing the trustee from liquidity pressures and requiring him to engage in frequent investment decision making." Id. at 968.

The Trustees shall diversify the investments of the Plan so as to minimize the risk of large loss unless under the circumstances it is clearly prudent not to do so, and to this end shall not invest more than 25% of the funds total assets at market value, in any security or other single investment, except upon a specific finding by the trustees that it would be clearly prudent to do so.

Since the limitation is not inconsistent with the ERISA requirements, it is binding on the trustees, 29 U.S.C. § 1104(a)(1)(D). No finding of prudence in the investment was made, though it was clear to the trustees, or should have been, that a $29 million investment was approximately 36% of the total assets.[10]

### EXPERT TESTIMONY

Marvin Gordon, an analyst of construction plans and estimator of construction costs, estimated that the cost of building the planned hotel and gambling casino, exclusive of financing charges and architectural fees, would be $34,364,000 (Tr. July 25, 1978 at p. 15a).

Gary Kent, a real estate appraiser with offices in Las Vegas, Nevada, estimated the cost of the entire project including cost of land, building, equipment and furnishings as a hotel and gambling casino, bank roll for the casino, including a 10% contingency for cost overruns, to be approximately $57,383,510. (Tr. July 25, 1978 at p. 28a). He estimated the annual gross income at $78,052,528 of which 62% is attributable to the gambling casino. In Mr. Kent's opinion, the project as a completed project and ongoing business would be worth $85,360,000. Approximately 22% of the total gambling population of Las Vegas comes to Las Vegas, from points east of Chicago. With the practice of bringing "high rollers or heavy customers" on junkets from distant places he felt the legalization of gambling in eastern parts of the country would not significantly affect the gambling business in Las Vegas; however, "if California legalized gambling . . . it would have a dramatic effect on casinos in Las Vegas." (Tr. July 25, 1978 at p. 45a).

Charles Barrett, a real estate consultant and broker, testified that the loan violated diversification standards and was further imprudent because of the many risks involved during construction including strikes, increase in cost of materials and labor, and the risk of failure to attract patrons to the hotel following completion. He stated that the failure of the borrower to demonstrate his ability to furnish sufficient equity capital for the completed project presented an insurmountable problem and a risk that the Plan should not assume.[11]

### CONCLUSION

The proposed loan as outlined in the commitment issued by the trustees violates 29 U.S.C. § 1104(a)(1)(B) and (C) in the following respects which present extraordinary risks:

(a) The project may not be completed for lack of equity capital.

(b) The project may not be completed because of strikes, increase in cost of construction, or poor management of construction.

(c) If completed, the hotel business may fail because of poor management, competition, or adverse economic conditions, or Las Vegas may lose its lure to gamblers because of competition in other parts of the country if gambling is legalized in states where it is now forbidden.

(d) If completed, the gambling casino may fail because of poor manage-

---

10. The trustees attempt to justify the failure to make such a finding by assuming that sale price of the Southampton property to be the market value; thus increasing the assets to $62 million. For example, see deposition testimony of Salvatore Picone taken June 16, 1978, at p. 41. Accepting the false assumption (the evidence showed that it was difficult to obtain an offer in excess of $11 million), the investment would represent approximately 30% of the total assets.

11. Mr. Barrett testified that "Ginnie Mae" certificates guaranteed by the Government, and bearing interest in excess of 9% are obtainable for investment of pension funds.

ment or adverse economic conditions or competition.

(e) Government guaranteed Ginnie Mae certificates are available bearing approximately the same interest rate as provided in the permanent mortgage.

(f) The Southampton land is saleable at a price in excess of cost, and it is imprudent and improper for the trustees to use a risky loan as a means of selling the Southampton property at a price in excess of market value for the purpose of showing increased total assets of the fund, knowing that the sale price is in excess of market value. It smacks of gimmickry.

(g) The loan represents a disproportionate commitment of the assets of the fund and violates 29 U.S.C. § 1104(a)(1)(B) and (C) and the trust agreement.

*DISPOSITION*

The plaintiff is entitled to judgment for the relief demanded in the amended complaint.

SO ORDERED.