Ted KATSAROS, et al., Plaintiffs,

v.

John CODY, et al., Defendants.

John CODY, et al., Third-Party Plaintiffs,

v.

Anthony G. ANGELOS, et al., Third-Party Defendants.

TEAMSTERS LOCAL 282 PENSION TRUST FUND, Second Third-Party Plaintiff,

v.

Anthony G. ANGELOS, et al., Second Third-Party Defendants.

Raymond J. DONOVAN, Secretary of the United States Department of Labor, Plaintiff,

v.

John CODY, et al., Defendants.

John CODY, et al., Third-Party Plaintiffs,

v.

Anthony G. ANGELOS, et al., Third-Party Defendants.

TEAMSTERS LOCAL 282 PENSION TRUST FUND, Second Third-Party Plaintiff,

v.

Anthony G. ANGELOS, et al., Second Third-Party Defendants.

Nos. CV 81–2277, CV 82–1920.

United States District Court, E.D. New York.

July 21, 1983.

Hall, Clifton & Schwartz, New York City, for plaintiffs Katsaros, et al.; Arthur Z. Schwartz, New York City, of counsel.

Richard P. Carr, Ellen L. Beard, Washington, D.C., for plaintiff U.S. Dept. of Labor.

Wilson, Elser, Edelman & Dicker, New York City, for defendant trustees and third-party plaintiffs; Edward J. Boyle, New York City, of counsel.

O'Connor & Mangan, P.C., Long Island City, N.Y., for defendant Teamsters Local 282 Pension Trust Fund and second third-party defendant; J. Warren Mangan, Long Island City, N.Y., of counsel.

Davis & Davis, New York City, for third-party defendant Angelos; Harold Davis, New York City, of counsel.

Townley & Updike, New York City, Kirkland & Ellis, Chicago, Ill., for third-party defendant Howe; James K. Leader, New York City, Bruce A. Featherstone, Chicago, Ill., of counsel.

Barnett & Beigel, Ltd., Chicago, Ill., Javits, Hinckley, Rabin & Engler, New York City, for third-party defendants Jensen and Karkazis; Ira J. Bornstein, New York City, of counsel.

Stroock & Stroock & Lavan, New York City, Jerome H. Torshen, Chicago, Ill., for third-party defendant Kirie; Janet F. Gerske, Chicago, Ill., of counsel.

Skadden, Arps, Slate, Meagher & Flom, New York City, for third-party defendant Jenner & Block; Michael W. Mitchell, New York City, of counsel.

## MEMORANDUM OF DECISION AND ORDER

MISHLER, District Judge.

In February and March of 1979 the trustees of the Teamsters Local 282 Pension Trust Fund ("Trustees"), approved and disbursed a loan of $2 million to the Des Plaines Bankcorporation, Inc. ("Bankcorporation"), a bank holding company. The loan was secured by all the stock in the Des Plaines Bank ("Bank"), a wholly-owned subsidiary of Bankcorporation. Following the closing of the Bank by federal and state regulatory officials on March 14, 1981, two separate actions were brought against the Trustees alleging violation of fiduciary

duties under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1101, et seq. The Teamsters Local 282 Pension Trust Fund ("Fund") was joined as a defendant. These actions were consolidated for pre-trial matters and are referred to here as the Katsaros action (CV 81–2277) and the Donovan action (CV 82–1920). The Trustees and the Fund brought separate third-party actions against the named directors of Bankcorporation ("Directors").

The above consolidated actions were tried to the court without a jury pursuant to the memorandum of decision and order dated April 5, 1983. That decision also severed the third-party claims in both actions. The issues decided herein relate only to the claims of the plaintiffs against the defendants and the defense interposed in the original actions (statute of limitations in the Katsaros action). The court finds:

## I. The Loan to the Des Plaines Bankcorporation, Inc.

In the fiscal year ending February 28, 1979, the Fund had assets of approximately $58 million. Approximately 80% of such assets were invested in stocks, bonds and commercial paper. (Exh. C). Since approximately 1965, John Cody was a trustee of the Fund and also a trustee of the Welfare Fund and Annuity Fund of Local 282 of the International Brotherhood of Teamsters.[1] During all pertinent times herein, Cody was the Administrator of the Pension, Welfare and Annuity Funds.[2]

Some time in the latter part of January 1978, Cody met Anthony G. Angelos, president and chairman of the board of directors of Bankcorporation at a social or union function. Angelos advised Cody that the Bank was seeking a loan. Cody suggested that Angelos have his lawyers make formal application to the Fund. On February 7, 1979, Jonathan T. Howe, a partner in the Chicago law firm of Jenner & Block, and a director and counsel to Bankcorporation, and counsel to the Bank, wrote to John Cody. The letter proposed a $2 million loan with interest at the Bank's floating prime rate, principal of $250,000 payable annually, the balance due four years from the date of the loan, to be secured by all the outstanding stock of the Bank. Howe requested the opportunity "to meet with you and your Board of Trustees at your forthcoming meeting on February 27, 1979." [Exh. 2A].

Cody met with Howe and Angelos on February 26. However, it was not until the next day, February 27, at the meeting of the Trustees, that Howe distributed financial statements of Bankcorporation and the Bank, i.e., consolidated financial statements of Bankcorporation and the Bank, as of December 31, 1978 (Exh. 5A), financial statement of the Bank as of December 31, 1978 (Exh. 5B), and a comparative schedule of assets of the Bank as of December 31, 1977, November 30, 1978 and December 31, 1978. (Exh. 5C). The three documents consisted of about 35 pages of figures and explanatory notes. The Trustees (other than Cody) who attended the meeting learned of the application for the first time at the meeting.[3]

Harvey Colton, a certified public accountant employed by the Fund since the early 1950's, attended the meeting. Colton disclaimed sufficient training to express an opinion on the soundness of the loan and

---

1. Cody has been president of Local 282 of the International Brotherhood of Teamsters since 1976.

2. At a meeting on or about October 28, 1977, the Fund had agreed to loan one Hyman Green $20 million to finance the construction of a hotel and gambling casino. Pursuant to the terms of the agreement dated February 22, 1978, Green deposited $50,000 with the Fund for costs incurred with relation to the loan. The loan was enjoined by this court on August 11, 1978. See Marshall v. Teamsters Local 282 Pension Trust Fund, 458 F.Supp. 986 (E.D.N.Y. 1978). The Fund charged the sum of $73,-437.77 as expenses. The Katsaros action seeks judgment directing the Trustees to reimburse the Fund in the amount of $23,473.57 on the first stated claim.

3. Defendant Nappi was not present at the February 27 meeting. Nappi attended the Trustees meeting of March 20 and voted in support of a motion to ratify the loan.

testified that no one on the Fund's staff had sufficient training to express an opinion on the loan. (Tr. at 117, 120).

Howe and Angelos made a two hour presentation after distributing the documents to the Trustees. Howe "touched on the highlights of the statement." (Tr. at 126). He showed that the Bank increased its assets of $68,000 in 1977 to $278,000 in 1978 and that "was the bottom line." (Tr. at 127 (Colton testimony); *see* Tr. at 46–47 (Cody Testimony)). Thereupon, the Trustees present unanimously voted to approve the loan as modified as follows:

> The terms of the loan would be for a payment of $125,000 of principal together with accrued interest on a semi-annual installments [sic] over a period of four years with a baloon [sic] payment at the end of the loan period. The amount of interest shall be at 1% over the prime rate of the Chase Manhattan Bank of New York with a floor of 10% computed on the basis of an actual 365 day year, until maturity. After maturity or default, the note shall bear interest at a rate of 2% over the prime rate or 11% per annum whichever is greater.

Exh. 6A at 10, minutes of Board of Trustees Meeting, Feb. 27, 1979.[4]

Bankcorporation was to pay a loan organization fee of $10,000 plus all expenses incurred in making the loan. Angelos was to give his personal guarantee for the repayment of the loan,[5] to be secured by Angelos' interest in vacant land on Halstead Street in Chicago.

The Trustees present unanimously authorized Cody and defendant Ralph Guercia to make the loan. Cody and Guercia, accompanied by Herbert Ballin, the Fund's counsel, left the next day for Chicago. They retained one Sherman Carmell, Esq., a Chicago lawyer, as their local counsel, to advise them on the closing loan documents and the requirements of local law. During the period that Ballin and Carmell were reviewing the loan documents with Howe (representing Bankcorporation), Cody and Guercia visited the Bank in the company of Angelos and viewed the real estate on Halstead Street.

The loan closed on March 1, 1979 at the offices of Jenner & Block. The closing documents included a mortgage on Angelos' interest in the Halstead property as collateral for Angelos' guarantee and an opinion letter from Jenner & Block. The Trustees were not provided with a title report of the Halstead property. The opinion letter of counsel stated that there were no actions, suits or proceedings pending against the Bankcorporation or the Bank which would adversely affect the operations of the Bankcorporation or the Bank. The proceeds of the loan were disbursed as follows:

---

4. The actual loan agreement provided that:
   > The Note shall be repaid over a four year period with seven semiannual installments in the amount of $125,000 of principal together with accrued interest, with the remaining balance of principal and accrued interest to be paid in a final installment due four years from the date of the Note. The Note shall bear interest from its date until maturity at the rate of one percent over the prime rate of the Chase Manhatten [sic] Bank of New York (said prime rate being defined for the purposes hereof as the lowest interest rate regularly charged from time to time by such bank on 90-day loans to borrowers of the highest credit rating. Any change in the Note rate shall, for the purposes hereof, be effective as of the date of announcement by such bank of a change in its prime rate) or ten (10) per cent, whichever is greater, computed on the basis of an actual day month, 365 day year,

until maturity. After maturity whether by acceleration or *otherwise the Note shall bear* interest at the rate of two (2) percent over the prime rate of Chase Manhattan Bank or eleven (11) percent per annum, whichever is greater.
   Exh. 7.

5. Though defendants suggest that the idea of Angelos' personal guarantee originated in the discussion, it is significant to note that Angelos had prepared a financial statement showing his net worth of $3,227,481 as of November 30, 1978. The accountant preparing the report stated that verification of Angelos' investment assets was "by reference to quoted market values and appraisals." One of the assets was a 63% interest in a vacant plot of land (60,000 square feet) on Halstead Street in Chicago, then used as a parking lot. Angelos' interest was stated to be worth $1,368,000. (Exh. 5D).

| | |
|---|---|
| Central National Bank | $1,032,426 |
| South Side Bank | 16,073 |
| Water Tower Trust & Savings Bank | 155,128 |
| Anthony Angelos | 288,373 |
| Fund (loan organization fee) | 10,000 |
| Bankcorporation | 500,000 |

(Exh. 12).

At a regular meeting of the Trustees on March 20, 1979, the Trustees (with Nappi present), unanimously ratified all the terms and conditions of the loan agreement and the actions of Cody and Guercia with reference to the loan.

The Fund received the first semi-annual installment of principal and interest in the amount of $253,548 (principal in the amount of $125,000 and the balance as interest) on September 4, 1979 (due September 1, 1979). The Fund received two additional payments of principal and interest: $276,511 on February 28, 1980 (due March 1, 1980) and $228,374 on August 30, 1980 (due September 1, 1980).[6]

The loan agreement obligated Bankcorporation to submit financial statements to the lender on the then current condition of the borrower (i.e., Bankcorporation). The statements submitted were, however, incomplete.[7] Although circulated among the Trustees, these statements were unaccompanied by any report or analysis. A cursory examination of the documents would have revealed that the Bank had discussed corrective measures with the Federal Deposit Insurance Corporation ("FDIC") relating to the financial soundness of the Bank. The Trustees had the right to additional information and the right to demand additional security under the terms of the loan agreement, as in effect during the period March 1, 1979 to March 1, 1981.[8]

**6.** Interest was erroneously computed on the basis of the prime rate in effect one month prior to the due date on each semi-annual payment. Plaintiffs claim that failing to compute interest as provided in the loan agreement, i.e., the prime rate as it fluctuates on a "floating" basis, cost the fund approximately $32,500 in lost interest.

**7.** For the period March 1979-March 1981, the Fund received: a one-page statement of condition of Bankcorporation, dated December 13, 1979; a set of audited financial statements for the Bank and Bankcorporation for the year 1979; a six-month unaudited, consolidated financial statement for the Bank and Bankcorporation, as of June 30, 1980; and an updated financial statement for Anthony G. Angelos, dated August 31, 1979. (Exh. 16A–E).

**8.** In pertinent part, the loan agreement provides:

5.3 *Furnishing of Financial Statements and Information.* Borrower will maintain a modern system of accounting administered in accordance with generally accepted accounting principles consistently maintaned [sic] and will deliver or cause to be delivered to Lender, in duplicate:

5.3.1 As soon as practicable and in any event within forty-five (45) days after the end of each accounting, quarterly financial statements of Borrower and Des Plaines Bank as of the end of such period including an income statement, balance sheet and surplus statement, setting forth in each case in comparative form figures for the corresponding period in the previous fiscal year (to the extent comparative figures are available) all in reasonable detail. To fairly present the financial condition of Des Plaines Bank and the Borrower as of the balance sheet date and the results of their operations for the period shown.

5.3.2 Within the 135 days after the end of the fiscal year of Borrower and the Des Plaines Bank, a copy of signed corporate financial statements, a copy of the annual audit report, prepared in conformity with generally accepted accounting principles applied on a basis consistent with that of the preceding fiscal year, and signed by independent certified public accountants satisfactory to Lender and a copy of the annual report, if any, to shareholders of the Des Plaines Bank.

5.3.3 Within reasonable promptness, such other data and information as from time to time may be reasonably requested by Lender.

5.3.4 Borrower will cause its outside auditors to furnish to Lender periodically and not less than semiannually a certification that they are not aware of any event of default of any of the terms of this Agreement, or, if they are aware of such an event, its nature and extent.

5.4 *Inspection.* Borrower will permit and will cause the Des Plaines Bank to permit any authorized representative designated by Lender in writing to examine the books and records of Borrower and the Des Plaines Bank and take memoranda and extracts therefrom, as permitted by law.

. . . .

5.6 *Book Value of Collateral.* The stock of the Des Plaines Bank pledged as collateral hereunder shall at all times have a book value of no less than $2,000,000 determined in accordance with generally accepted accounting principles, provided however that only

*The Trustees' Fiduciary Duty Under Section 404(a)(1)(B) of ERISA*

■ The obligation of trustees of an employee benefit plan in investing a plan's assets is analyzed under common law principles of trusts "bearing in mind the special nature and purpose of employee benefit plans." S.Rep. No. 1090, 93d Cong., 2d Sess. 302 (1974), *discussed in Marshall v. Teamsters Local 282 Trust Fund,* 458 F.Supp. 986, 990 (E.D.N.Y.1978). *See also Donovan v. Daugherty,* 550 F.Supp. 390, 403 (S.D. Ala.1982); *Marshall v. Glass/Metal Ass'n and Glaziers and Glassworkers Pension Plan,* 507 F.Supp. 378, 383 (D. Hawaii 1980); Note, *Fiduciary Standards and the Prudent Man Rule Under the Employment Retirement Income Security Act of 1974,* 88 Harv. L.Rev. 960, 966–67 (1975) [hereinafter *Fiduciary Standards*].

Section 404(a)(1)(B) of ERISA, 29 U.S.C. § 1104(a)(1)(B), defines the obligation of a trustee in investing the plan's assets under the "prudent man standard" as follows:

[A] fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and—

. . . .

(B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

Defendants argue that the evidence fails to support the alleged breach of fiduciary duty in that it shows that the Trustees relied in good faith on the presentation made by Angelos and Howe at the February 27 meeting.[9] They point to the consolidated financial statement (Exh. 5A) which showed an increase in assets from $42 million to $52 million during the year 1978. The financial statements showed the income to Bankcorporation from the Bank increased to $427,110 in 1978 from $186,959 in 1977; the statements showed the loss reserve increased in 1978 to $246,336, from $220,000 in 1977, while the actual loan losses decreased from $126,707 in 1977 to $82,261 in 1978. (Exh. 5A)

Defendants further argue that (employer-trustee) Herbert Schneider's insistence on Angelos' personal guarantee, collateralized as indicated, showed a measure of good business judgment and prudence in considering the loan.

The duties of a trustee are "the highest known to the law." *Donovan v. Bierwirth,* 680 F.2d 263, 272 n. 8 (2d Cir.), *cert. denied,* — U.S. ——, 103 S.Ct. 488, 74 L.Ed.2d 631 (1982). *See Restatement (Second) of Trusts* § 2 comment b (1959) ("The duties of a trustee are more intensive than the duties of some other fiduciaries."). The prudent man standard of care is the objective

standard of a man of ordinary prudence in dealing with his own property. A trustee is liable for a loss resulting from his failure to use the care and skill of a man of ordinary prudence, although he may have exercised all the care and skill of which he was capable.

*Restatement (Second) of Trusts* § 174 comment a (1959). *See* Bogert, *Trusts & Trustees* § 541, at 164 (rev. 2d ed. 1978).

---

one-half of the reserves shall be used in the computation. In the event that the book value as determined shall at any time or times be less than the required amount, Borrowers will deliver or cause to be delivered additional shares of the Des Plaines Bank, or other acceptable securities or negotiable instruments duly endorsed as additional collateral in an amount sufficient to maintain said requirement.

5.7 *Insurance.* Borrower will cause the Des Plaines Bank to maintain insurance for the Des Plaines Bank to such extent and against such hazards and liabilities as is commonly maintained by companies similarly situated and will furnish upon request a statement showing details of the insurance being so maintained.

9. The Trustees were advised that Angelos had some experience in banks prior to acquiring an interest in Bankcorporation in 1977; he had been considered for appointment to the position of Commissioner of Insurance for the State of Illinois. Howe was a member of the prestigious law firm of Jenner & Block in Chicago.

Where a trustee does not possess the education, experience and skill required to make a decision concerning the investment of a plan's assets, he has an affirmative duty to seek independent counsel in making the decision. *Donovan v. Bierwirth,* 680 F.2d at 272–73, *Donovan v. Bierwirth,* 538 F.Supp. 463, 470 (E.D.N.Y.1981), *aff'd as modified,* 680 F.2d 263 (2d Cir.), *cert. denied,* —— U.S. ——, 103 S.Ct. 488, 74 L.Ed.2d 631 (1982), *citing Fiduciary Standards, supra* at 965; *Mills v. Bluestein,* 275 N.Y. 317, 9 N.E.2d 944 (1937); *Chemical Bank & Trust Co. v. Reynaud,* 150 Misc. 821, 270 N.Y.S. 301 (Sup.Ct.), *aff'd,* 239 A.D. 904, 265 N.Y.S. 944 (1st Dep't 1933). The failure to seek outside counsel when "under the circumstances then prevailing ... a prudent man acting in a like capacity and familiar with such matters" would seek outside counsel, is imprudent and a violation of ERISA. Section 404(a)(1)(B) of ERISA, 29 U.S.C. § 1104(a)(1)(B). The conduct of a trustee in making an independent investigation is an indication of the care and diligence of the trustee in arriving at an investment decision. A trustee unfamiliar with an unusual or difficult investment decision is charged with making an "independent inquiry into the merits of particular investments rather than [relying] wholly upon the advice of others." *Withers v. Teachers' Retirement System,* 447 F.Supp. 1248, 1254 (S.D.N.Y.1978), *aff'd mem.,* 595 F.2d 1210 (2d Cir.1979); *see* Bogert, *supra,* § 541, at 164–65. A trustee's duty to make an independent investigation includes the negative obligation of not relying on the representations, predictions and hopes of a borrower.

Relying on the advice or information of a co-trustee alone may subject a trustee to liability. If a trustee believes that a co-trustee is violating his fiduciary obligation, he must make "reasonable efforts under the circumstances to remedy the breach." Section 405(a)(3) of ERISA, 29 U.S.C. § 1105(a)(3). *See Morrissey v.*

*Curran,* 567 F.2d 546, 549–51 (2d Cir.1977) (Lumbard, J., concurring).

Here, the manner in which the loan to Bankcorporation was proposed and presented was designed to discourage inquiry into the merits. Urgency and speed overrode the need for calm deliberate inquiry and discussion.[10] Colton apparently attended the meeting to advise the Board members on other matters on the agenda. No Trustee asked him to express his opinion on the advisability of making the loan. At any rate, he did not think that he was qualified to express an opinion with relation to the financial statements of Bankcorporation and the Bank. (Tr. at 114–25). The Trustees considered only the information and representations given by the borrowers, as presented by Angelos and Howe.

An independent investigation would have disclosed that it would have been imprudent to make the loan based on the financial statements of Bankcorporation and the Bank. The sole source of income of Bankcorporation was the earnings of the Bank. An analysis of the financial statements by an expert would have revealed the following:

*Capital Adequacy*

The net worth of Bankcorporation and the Bank as set forth in the financial statement submitted to the Trustees on February 27 was $1.8 million. This included an item of goodwill valued at $1.3 million. The tangible net worth of Bankcorporation was only $500,000. Since this net equity figure is based on the quality of the loans the Bank made (as part of the Bank's assets), an analysis of the loans would have been part of the investigation. The significant increase in earnings for the year 1978 over 1977 would indicate that the Bank's loans were at a higher than normal interest rate and therefore riskier. The increase in the Bank's loans, though generating more income, placed the limited resources of the

---

**10.** Cody had not even discussed the loan with Harvey Colton, the Plan's accountant, prior to the meeting. *See* Tr. at 115–16 (Colton's testimony).

Bank in greater danger of loss.[11] The ratio of the Bank's equity (net worth) to its loans and other assets as of December 31, 1978 was 4.53%. In the State of Illinois, comparing the capital adequacy of the Bank with other banks of similar size, the Bank ranked 149th out of 151 banks. (Exh. 28, 28A).

*Loan Loss Reserve*

Despite the substantial increase in loans the Bank's loan loss reserve was increased to only $246,334 as of December 31, 1978, from $220,000 as of December 31, 1977. The percentage of the loss reserve to outstanding loans fell from 1.03% to .75%. A conservative estimate of loan loss reserve would be 1% of the outstanding loans. The loan loss reserve should have been not less than $327,000. The decrease in percentage was a factor in showing higher net earnings for the year 1978.

*Profitability*

The Bank earned .76% on its assets in 1977. The statements reported an increase to .94% in 1978. The earning power of a bank is measured by the ratio of earnings to total assets. The earning power of the Bank was ranked 96th out of 151 banks of comparable size in Illinois. The statistics do not reflect the interest on the loan as a charge against the bank since the loan was the obligation of Bankcorporation. If such charge were made, the earning power would, consequently, be reduced proportionately. (Exh. 28).

*Ability to Repay*

The loan agreement required payments of principal in the amount of $250,000 plus interest in the amount of approximately $200,000 in 1980 and 1981 (interest of approximately $130,000 in 1982). The net income of Bankcorporation in 1978 was $278,000. Bankcorporation would be unable to meet the loan obligations from its net income, if the earnings were at the 1978 level, even based on the favorable method of stating its earnings.

11. The aggregate amount of loans made by the Bank as of December 31, 1977 was $21 million.

*Liquidity*

The Trustees were advised that the Bank had a cash flow problem. The increase of $500,000 in the available cash could only have a minimum effect toward solution of the problem. The total deposits of the Bank increased 24% in 1978. The Bank's total loans constituted a sum equal to 67% of its deposits. If the deposits were withdrawn at a faster rate than the loans were repaid, the Bank could have been embarrassed. An inquiry into the nature of the increased deposits was appropriate.

*The Bank Stock as Security*

The financial statement of the Bank valued the stockholders' equity at $2 million as of December 31, 1978. Acceptance of this figure as the value of the security was imprudent. Ordinarily, the value of bank stock to a lender who is not in the banking business is highly uncertain. On default, the Trustees would have found it difficult to sell the stock to multi-bank holding corporations under Illinois law. Based on the financial statement, the Bank's stock was inadequate security for the loan.

*Angelos' Guarantee*

1. *Appraisal*

Angelos' personal guarantee was secured by his interest in vacant land (used as a parking lot) on Halstead Street near downtown Chicago. Angelos' statement of assets valued the land at $2.8 million subject only to "loan and sundry advances" in the amount of $600,000. It also stated that "[t]he valuations contained herein are based on appraisals." The statement showed Angelos' interest to be 63% and the value of his interest to be $1,386,000.

The Trustees failed to order an independent appraisal of the property; they did not request the appraisal on which Angelos based the value of $1,386,000, as stated in his financial statement. After the default by Bankcorporation in the payments due under the loan in March 1981, the Trustees had the property appraised. It was ap-

On December 31, 1978 it was $32.7 million, an increase of 55%.

praised at $1 million. Based on this appraisal, Angelos' interest in the property should have been valued at about $252,000 and not $1,386,000. Such an inquiry would probably have led the Trustees to question the value of other assets in the financial statement.

### 2. Title

■ On March 1, 1979, the very day of the loan closing in Chicago, the Halstead Street property was sold by Cook County for unpaid general taxes for the year 1977. The Trustees failed to have a title (and tax) search, which would have revealed a default in the payment of taxes for the years 1977 and 1978 (approximately $2,000). The property was redeemed by Angelos on September 7, 1979.[12]

### Inquiry of Des Plaines Bank's Lender

With a minimum of effort the Trustees could have questioned the Central National Bank concerning the history of its loan to the Bank. The unpaid principal amount of the loan at that time was about $1 million and renewal of the loan was refused by Central National. In all probability, inquiry would have led the Trustees to learn that at least five (5) banks in the Chicago area refused to refinance the Central National Bank loan which was due to mature on March 1, 1979. Such inquiry could reasonably have led to a disturbing report issued by the FDIC underscoring the Bank's undercapitalization, its loan-deposit ratio, and the high percentage of both substandard loans and restaurant loans.

**12.** The retention of counsel to inquire into questions of title does not relieve the trustee of his duty to investigate.

While the taking of *advice of counsel* or other specialist has some effect in tending to show the use of reasonable care by a trustee, it is not conclusive. The trustee has a duty to examine the opinion of the specialist so far as the ability of a reasonably intelligent man would permit and to exercise what judgment he can as to its soundness. Thus if it is a valuation by a real estate appraiser the trustee may well require that the elements of

### Conclusion

■ In approving the loan of $2 million to Bankcorporation the Trustees violated their fiduciary obligation to the participants and beneficiaries of the Fund under Section 404(a)(1)(B) of ERISA, 29 U.S.C. § 1104(a)(1)(B), by failing to use that degree of care, skill, prudence and diligence that a prudent man would exercise under the circumstances then prevailing. Defendant Nappi, having voted on March 20, 1979 to ratify and approve the loan, in violation of his duty to disapprove, is jointly liable with the other Trustees for any loss to the Fund.

### II. The Expenses Respecting a Loan to Hyman Green

The Katsaros complaint (in addition to seeking relief based on the imprudent loan made to Bankcorporation), seeks reimbursement of expenses in connection with the agreement to loan one Hyman Green $20 million to finance the construction of a hotel and gambling casino in Las Vegas, Nevada. This court enjoined the loan to Green as violative of Section 404(a)(1) of ERISA, 29 U.S.C. § 1104(a)(1). *Marshall v. Teamsters Local 282 Pension Trust Fund,* 458 F.Supp. 986 (E.D.N.Y.1978). The agreement required Green to pay all costs and expenses related to the loan. Katsaros alleges that the Fund expended sums in excess of $100,000. The Trustees state that the sum of $73,473.57 was disbursed; that Green reimbursed the Fund in the amount of $50,000 and the balance of $23,474.57 is due and owing from Green. The Trustees assert the statute of limitations under Section 413 of ERISA, 29 U.S.C. § 1113 as a bar.[13]

value be separately stated.... The trustee cannot shift the burden of decision to others. Bogert, *supra,* § 541 at 164–65 (emphasis in original) (footnotes omitted).

**13.** Section 413 of ERISA, 29 U.S.C. § 1113, provides:

§ 1113. Limitation of actions.

[(a)] No action may be commenced under this title with respect to a fiduciary's breach of any responsibility, duty, or obligation under this part, or with respect to a violation of this part, after the earlier of—

The parties stipulated to agreement on the following facts:

1. The Green loan agreement was signed in February 1978.

2. Katsaros and other named plaintiffs knew of the loan agreement prior to March 23, 1978.

3. The Secretary of Labor instituted the action entitled *Marshall v. Teamsters Local 282 Pension Trust Fund* by filing a complaint with the Clerk of the Court on April 23, 1978.

4. Katsaros and other named plaintiffs were aware of the pendency of the *Marshall* action prior to March 31, 1978.

5. By memorandum of decision and order dated August 11, 1978, after a trial on the merits, this court held that the loan agreement violated Section 404(a)(1)(B)–(C) of ERISA, 29 U.S.C. § 1104(a)(1)(B)–(C), and directed the entry of judgment enjoining the Trustees from performing the terms of the loan agreement. 458 F.Supp. at 986.

6. Green brought an action against the Fund and the Trustees on November 5, 1980, *Green v. Teamsters Local 282 Pension Trust Fund, et al.*, No. CV 80–3077, to recover certain expenses. On March 16, 1981, the Fund interposed an answer in that action including a counterclaim for the unpaid balance of the sums disbursed in the amount of $23,473.57.

7. Green filed his reply to the counterclaim on April 1, 1981.

8. Plaintiffs were unaware that reimbursement had not been made in full by Green until the Fund interposed its counterclaim.

9. The *Katsaros* action was commenced on July 14, 1981.

The *Katsaros* action is brought by Katsaros, Kuebler, Trott, Kudla and Curd as participants in the Fund pursuant to Section 502(a)(3) of ERISA, 29 U.S.C. § 1132(a)(3) for reimbursement of monies spent in "arranging the aforedescribed prohibited transaction and unsuccessfully defending the aforedescribed injunctive action . . . ." (Par. 10, Amended Complaint). The court is presented with the question as to when plaintiffs "had actual knowledge of the breach or violation."

Plaintiffs were aware, or should have been aware, of the Trustees' violation of their fiduciary duty (in agreeing to make the loan to Green) at the time the claim of the Secretary was pending in *Marshall v. Teamsters Local 282 Pension Fund, supra.* Katsaros fixes the date prior to March 31, 1978. *Arneil v. Ramsey,* 550 F.2d 774, 780 (2d Cir.1977); *Berry Petroleum Co. v. Adams & Peck,* 518 F.2d 402, 410 (2d Cir.1975). However, the breach of fiduciary duty claimed here is based on the failure of the Trustees to take the necessary steps to recover monies expended with relation to the Green loan, including the expenses of defending the action brought by the Secretary. Costs and disbursements in defense of that action could not be determined before August 11, 1978 when the court filed its memorandum of decision and order. The obligation of the Trustees to demand reimbursement was a continuing one. The court finds (on the stipulation of facts) that the Trustees did not make their demand of Green until they interposed a counterclaim on March 16, 1981.

■ I find the *Katsaros* action was timely brought on March 14, 1981; within three (3) years of this court's decision and order of August 11, 1978. Three years is the shortest period of limitation set forth under 29 U.S.C. § 1113.[14] Thus, under any method of analysis, the Trustees' defense

(1) six years after (A) the date of the last action which constituted a part of the breach or violation, or (B) in the case of an omission, the latest date on which the fiduciary could have cured the breach or violation, or

(2) three years after the earliest date (A) on which the plaintiff had actual knowledge of the breach or violation, or (B) on which a report from which he could reasonably be expected to have obtained knowledge of such breach or violation was filed with the Secretary under this title;

except that in the case of fraud or concealment, such action may be commenced not later than six years after the date of discovery of such breach or violation.

**14.** *See* note 13, *supra.*

under the ERISA statute of limitations must be rejected.

### III. *Conclusion*

Plaintiffs in *Donovan v. Cody*, CV 82–1920, and *Katsaros v. Cody*, CV 81–2277, are entitled to judgment against the defendant Trustees directing the defendants jointly and severally for any and all loss resulting from the default by Bankcorporation in the terms and conditions of the loan agreement.

Plaintiffs in *Katsaros v. Cody* are entitled to judgment against the defendant Trustees (except Guercia) directing such defendants to pay the sum of $23,473.57, together with interest from the day the monies were disbursed.

The case is set down for a hearing on August 19, 1983 at 1:00 p.m. to determine damages in addition to those above mentioned resulting from the default in the loan agreement and any other relief to which the plaintiffs are entitled as a result of the Trustee's violation of their fiduciary duty.

SO ORDERED.