MAZUR, et al.

v.

GAUDET, et al.

Civ. A. No. 89–2723.

United States District Court, E.D. Louisiana.

Feb. 7, 1992.

## ORDER AND REASONS FOR RULING

CLEMENT, District Judge.

This matter is before the Court on Plaintiffs' motion for summary judgment, or, in the alternative, partial summary judgment on the issues of the liability of the trustee defendants, the liability of John Chancellor and coverage under the ULICO policy, and ULICO's motion for summary judgment and/or to dismiss.

## FACTS AND PROCEDURAL HISTORY

The New Orleans Sheet Metal Workers' "Health and Welfare" and "Pension and Retirement" Funds are administered by a board of trustees consisting of three employee trustees and three employer trustees. Defendant Stanley Gaudet was an employee trustee of the Funds from 1974 until 1989. In 1989, Gaudet pled guilty to embezzling $2,593,903.37 from the Funds before October, 1988. In April, 1991, Gaudet pled guilty to federal charges of theft and embezzlement.

As part of the embezzlement scheme, Gaudet would make withdrawals from the Funds' checking or EF Hutton accounts. Instead of purchasing CDs for the Funds with this money, Gaudet would take the check to a bank and obtain a certified check with which he would either purchase a CD or deposit the check into a bank account he maintained for himself. Gaudet would draft false safekeeping receipts to give to the Funds' administrator as a record of investments he supposedly made on behalf of the Funds.

Plaintiffs are current trustees of the Funds and, on behalf of the Union and the Funds, have sued Gaudet, the other trustees who served with Gaudet, Aetna (the trustees' insurer from October 1987 to October 1988), and ULICO (the trustees' insurer from December 1988 to December 1989) for the trustees' alleged breaches of fiduciary duty, and the trustees' accountant, John Chancellor, for malpractice. The trustee defendants filed third party claims against ULICO, who was an insurer of the trustees from December 1988 to December 1989. ULICO has filed a counter-claim for recission, reformation and cancellation of its insurance contract with the trustees.

Plaintiffs have moved for summary judgment, or, in the alternative, partial summary judgment on the issues of the trustees' liability, John Chancellor's liability and coverage under the ULICO policy. ULICO has moved for summary judgment dismissing all claims against it.

## LIABILITY OF THE TRUSTEES FOR BREACH OF FIDUCIARY DUTY

■ ERISA provides for the liability of fiduciaries for permitting a breach of fiduciary responsibility of another fiduciary in certain circumstances. 29 U.S.C. § 1105(a). Those circumstances are:

(1) if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach;

(2) if, by his failure to comply with section 404(a)(1) [29 U.S.C. § 1104(a)(1) ] in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or

(3) if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

*Id.* In this case, the plaintiffs have not alleged that any of the trustee defendants either participated in or knew about Gaudet's crimes. Thus, any liability on the part of the trustee defendants to be liable will be under subsection (2) above [29 U.S.C. § 1105(a)(2) ].[1]

Liability under § 1105(a)(2), in turn, is based upon a breach of duty by the defendants themselves which enabled the co-fiduciary to commit a breach. For purposes of this case, that means that the defendant trustees, to be liable, would have had to have breached their fiduciary duties under § 1104(a)(1), thus allowing Gaudet to embezzle funds. The relevant portions of § 1104(a)(1) are §§ 1104(a)(1)(B) and (D), which provide that "a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and—

(B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims," and

"(D) in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with the provisions of this title or title IV."

For purposes of plaintiffs' summary judgment motion, the question is whether, looking at the evidence in a light most favorable to the defendants, the evidence establishes that the defendant trustees breached their fiduciary duty to the beneficiaries, thus enabling Gaudet to commit his misdeeds.

Plaintiffs have established that the trustees had very little involvement in the management of the Funds. For example, none of the trustees never conducted an independent investigation to verify whether the Funds' assets were protected. There was also no procedure implemented in which to review checks the Fund had issued.

1. There is also an exception to liability under § 1105. It is found in § 1105(c), which provides that if the plan "expressly" provides for procedures allocating fiduciary responsibilities among certain fiduciaries or to designated persons other than named fiduciaries, then the named fiducia-

ries will not be responsible for the acts or omissions of those other people. Defendants, however, have not produced any evidence that the Plan ever "expressly provided" for procedures allocating fiduciary responsibilities to Gaudet or to Chancellor.

Plaintiffs also note that Section 5.1 of the trust document for each fund required two signatures on all instruments executed on behalf of the fund, one of an employer trustee and one of an employee trustee. It is undisputed that Gaudet used a signature stamp bearing the name of Charles Leysath, an employer trustee, even after Leysath had left the board, in violation of Section 5.1. There was no procedure in place to verify whether the two signature rule was being followed.

Four of the eight trustee defendants testified that they never saw an original certificate of deposit, an original safekeeping receipt, an original bond, original stock certificate nor any other documentation regarding investments. Another trustee defendant testified that he never saw an original certificate of deposit and never saw an original certificate of deposit safekeeping receipt between the late 1970s and 1988, when his term ended. Two defendants testified that they did nothing but attend the meetings. One defendant testified that, while he was on the board, Gaudet was the only one who took care of the Funds' investments. One trustee defendant, Mr. Holzer, was aware that Gaudet was managing the investments by himself, even though Gaudet had no authority to act alone. Holzer was also aware of a 1978 board resolution requiring an annual inspection of the Funds' securities and bank accounts, a practice which was later abandoned even though the resolution was never rescinded. Holzer testified that he wanted an independent money manager because he did not want Gaudet handling the investment transactions alone, but this was never done.

The trustee defendants were also ignorant about the Pension and Retirement Fund's "401(h)" retirement plan, which plaintiffs allege was underfunded from 1985 through 1989. Seven of the trustee defendants testified that they had heard of the plan, but played no role in managing it. The eighth trustee defendant, Mr. Williams, had not even heard of it.

The defendants deny a number of these factual assertions in their opposition to plaintiffs' summary judgment motion, but do not present any evidence in support of these denials. The Court finds this practice bothersome.[2] The defendants provide no affirmative evidence contradicting plaintiffs' assertions that the trustees did nothing personally to oversee Gaudet.

The only affirmative evidence presented by the defendants in support of the proposition that the trustees did satisfy their fiduciary duty is evidence indicating reliance upon experts. The defendants cite deposition excerpts indicating that the trustees, as individuals with little business or finance experience, relied on the annual audits performed by accountant John Chancellor and on the legal advice provided by attorney Philip Schuler. For example, employer trustee Charles Leysath testified that he thought that Chancellor's audits were "certified and verified," which indicated that "the CD's were actually in the bank, that they were actually there, that the money was there. And I [Leysath] accepted that." The defendants argue that there is a factual question as to whether this reliance upon Chancellor and Schuler constitutes satisfactory performance of the trustees' fiduciary duty.

■ Defendants are correct in their assertion that reliance upon experts is a "factor relevant to determining whether [the trustees] acted with the prudence required by ERISA." *Donaldson v. Cook,* 567 F.Supp. 225, 239 (E.D.Va.1983), *aff'd,* 734 F.2d 10 (4th Cir.1984), *cert. den.,* 469 U.S. 899, 105 S.Ct. 275, 83 L.Ed.2d 211 (1984). The defendants also cite *Katsaros v. Cody,* 568 F.Supp. 360 (E.D.N.Y.1983),[3] and *Dole v. Formica,* 14

---

**2.** "Defendants, in their brief opposition to plaintiffs' motion for partial summary judgment, allege the existence of numerous factual disputes without specific reference to supporting authority in the record. The court finds this practice bothersome, particularly where, as here, the parties submit hundreds of pages of deposition transcripts, exhibits and affidavit testimony. Defendants are admonished to provide thorough and appropriate citation to the record in the future." *Hunt v. Magnell,* 758 F.Supp. 1292, 1297 n. 8 (D.Minn.1991).

**3.** "While the taking of advice of counsel or other specialists has some effect tending to show the use of reasonable care by a Trustee, it is not conclusive." 568 F.Supp. at 369 n. 12.

E.B.C. 1397, 1991 WL 317040 (N.D.Oh.1991), in support of this proposition.

Plaintiffs note that reliance on experts cannot be a complete defense to a charge of imprudence. *Donovan v. Mazzola*, 716 F.2d 1226, 1234 (9th Cir.1983), *cert. den.*, 464 U.S. 1040, 104 S.Ct. 704, 79 L.Ed.2d 169 (1984). Plaintiffs also note that ERISA trustees have a duty to conduct their own independent investigation of the Funds' investments, even where experts have been consulted. *Katsaros v. Cody, supra*, 568 F.Supp. at 367; *Dole v. Formica, supra*, 14 E.B.C. at 1408.

■ Although it is not a complete defense, the defendants are correct that reliance upon experts is a factor to be taken into consideration by the factfinder in making the factual determination of whether the trustees acted prudently. However, the existence of one (arguably) unanswered factual question does not mean that summary judgment is precluded. On a motion for summary judgment, "where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Washington v. Allstate Ins. Co.*, 901 F.2d 1281, 1286 *reh'g den.* (5th Cir.1990) (citing *Matsushita Electric Ind. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986)). The question before the Court, then, is whether "a rational trier of fact," in light of all the evidence presented, could reasonably find that the trustees acted both prudently and in accordance with the rules of the Funds.

The defendants have taken the position that a rational factfinder could find that the trustees acted prudently, despite the fact that *none* of them ever played a significant role in managing the funds assets. Under § 1104(a)(1)(B), an ERISA trustee is obligat-

ed to do more than simply attend the meetings and rely on the accountant's annual audits. The trustees have an independent duty to comply with ERISA. *Donaldson*, 567 F.Supp. at 1408. For purposes of ERISA § 1104(a)(1)(B), "a pure heart and an empty head are not good enough." *Donovan v. Cunningham*, 716 F.2d 1455, 1467 (5th Cir.1983). Furthermore, the trustees violated § 1104(a)(1)(D) by not complying with Section 5.1 of the Fund rules which requires two signatures on all instruments executed on behalf of the Funds.

The Court is aware that summary judgment for the plaintiff in this context is unusual. However, courts have granted plaintiffs' summary judgment motions in exceptional ERISA fiduciary cases where the factfinder could not reasonably find that the trustees were prudent or had not violated the rules of the trust.[4] This is one such case. Accordingly, plaintiffs' summary judgment motion on the issue of the trustees' liability must be granted.

## THE LIABILITY OF JOHN CHANCELLOR

■ The plaintiffs note that Chancellor admits to not having performed his annual audits of the Funds' assets in accordance with generally accepted auditing standards ("GAAS"). Chancellor also admits failing to obtain sufficient evidence to confirm the existence and ownership of cash investments of the Funds. He only reviewed copies of the safekeeping receipts and admits that he conducted no confirmation of the Funds' assets which would have been the proper procedure to employ. An expert report submitted by the plaintiffs further supports the position that Chancellor breached his fiduciary duty.[5]

---

4. *Whitfield v. Cohen*, 682 F.Supp. 188 (S.D.N.Y. 1988), is a particularly compelling case. In granting summary judgment for the plaintiff (U.S. Dept. of Labor), the court held that a "fiduciary must ascertain within a reasonable time whether an agent to whom he has delegated a trust power is properly carrying out his responsibilities. If a fiduciary is negligent in selecting, instructing or supervising an agent, he will be held liable to the trust beneficiary for any resulting loss." *Id.* at 196–97. *See also Dardaganis v. Grace Capital, Inc.*, 664 F.Supp. 105 (S.D.N.Y. 1987) (summary judgment for plaintiff appropri-

ate where defendant trustees made investments that violated pension fund rules); *Chambers v. Kaleidoscope, Inc. Profit Sharing Plan*, 650 F.Supp. 359 (N.D.Ga.1986) (summary judgment for plaintiff appropriate where defendant trustees failed to disclose information to beneficiaries as required by statute).

5. The report of William R. Legier, CPA, asserts that Chancellor (1) did not have the technical training or proficiency as an auditor to accept this engagement, (2) did not comply with GAAS in planning the audit engagement, (3) did not

The evidence of Chancellor's malpractice, consisting of depositions and an expert report, is uncontroverted by any evidence presented by any other party. Furthermore, no party has opposed plaintiffs' summary judgment motion on issue. Accordingly, plaintiffs' motion for summary judgment on the issue of John Chancellor's liability must be granted.

## IS ULICO'S POLICY VOID *AB INITIO*?

■ Louisiana law provides that an insurance policy is void *ab initio* if a material "oral or written misrepresentation or warranty [is] made in the negotiation of an insurance contract, by the insured in his behalf ... [if] the misrepresentation or warranty is made with the intent to deceive" or if it would have affected the insurer's decision whether to proceed with the arrangement or the rate charged. *Estate of Borer v. Louisiana Health Service*, 398 So.2d 1124, 1125 (La.1981); La. R.S. § 22:619.

■ The trustees were insured by ULICO, effective from December 21, 1988 until December 21, 1989, against claims against them arising from their "wrongful acts."[6] The application for insurance contained the following question:

> Is the Trust Fund or any of the Trustees aware of any circumstances which may result in any claim being made against the Trust Fund or any of the present or past Trustees for errors or omissions?

Trustees Marvin Matherne and Gaudet answered "No," and, at the end of the application, declared that "the above statements and particulars are true and I/We have not suppressed or misstated any material fact ...", etc.

ULICO and a new board of trustees renewed the insurance contract for the following two years, from December 1989 to December 1990, and from December 1990 to December 1991.[7]

The two questions to be answered here: whether Gaudet's misrepresentations (1) would have affected ULICO's decision to proceed or the rate charged, and (2) make the policy void as to *all* of the trustees, or just as to Gaudet.

The threshold question, whether ULICO would have proceeded if it knew of Gaudet's misdeeds, is is a question of fact. Plaintiffs contend that it is a contested material fact and thus not properly resolved by summary judgment. Plaintiffs note that the only evidence ULICO has produced to support the notion that they would not have issued the policy is the self-serving deposition testimony of one of its personnel. Granted, this evidence is self-serving, but it doubtful that plaintiffs could ever produce any counterevidence. It may be a question of fact as to whether ULICO would have entered this arrangement under the same terms had it known of Gaudet's thefts, but it is a question of fact with only one rational answer—if ULICO had known that Gaudet had embezzled, it would not have insured the trustees, at least not on the same terms.[8]

comply with GAAS regarding the study and evaluation of internal controls and communication of weaknesses therein noted with the appropriate level of management, (4) did not meet the minimum requirements of GAAS in obtaining sufficient, competent evidential matter to afford a reasonable basis for his opinion on the financial statements, (5) did not comply with GAAS by stating in the auditors report material departures from generally accepted accounting principles, (6) did not comply with GAAS in reporting on the format and disclosures of the financial statements in the audit report, and (7) did not comply with GAAS regarding expressing the appropriate opinion on the financial statements based on the work performed.

6. Section II(e) of the policy defines "wrongful act" as "any actual or alleged error or omission or breach of fiduciary duty committed or alleged to have been committed by the Insureds, either jointly or severally, in the discharge of their fiduciary duties, obligations or responsibilities, including the violation of any Federal fiduciary standards."

7. Plaintiffs point out that, even if the 1988–89 ULICO contract is found to be void *ab initio*, it should have no effect on the 1989–90 and 1990–91 coverage. This is true, but plaintiffs have not alleged that any wrongdoing on the part of the trustees occurred during those periods. In fact, the trustees who served during those periods are not defendants, they are the plaintiffs. Thus, for purposes of this action, this is a moot point.

8. Plaintiffs argue that ULICO's renewal of the policy for the following two years, after Gaudet's thefts had become known, estops ULICO from

Case law is sparse on the second question—whether misrepresentations by one insured voids the contract as to all insureds. As ULICO notes, the prevailing rule is that the entire policy will be rescinded as to all insureds even though only one insured was involved in the misrepresentation. *Bird v. Penn Central Co.*, 334 F.Supp. 255, 260–62 (E.D.Pa.1971); *Shapiro v. Am. Home Assur. Co.*, 584 F.Supp. 1245 (D.Mass.1984) (*Shapiro I* ); *INA Underwriters Ins. Co. v. D.H. Forde & Co.*, 630 F.Supp. 76, 77 (W.D.N.Y. 1985).

■ However, as plaintiffs point out, the policy will not be rescinded as to all insureds if it contains a severability clause. The plaintiffs rely on two cases in which courts held that, because of severability clauses, "innocent" insureds are still covered even if other insureds made misrepresentations to the insurer in the application. *Shapiro v. Am. Home Assur. Co.*, 616 F.Supp. 900 (D.Mass.1984) (*Shapiro II* ); *Wedtech Corp. v. Federal Ins. Co.*, 740 F.Supp. 214 (S.D.N.Y.1990).

Plaintiffs contend that Section V of the insurance contract is a severability clause. Section V reads as follows:

Waiver of Exclusions and Conditions

Whenever coverage under any provision of this policy would be excluded, suspended or lost:

(a) because of any exclusion relating to dishonest, fraudulent, or malicious act or willful or reckless violation of any statute, by an Insured with respect to which any other Insured did not personally participate or personally acquiesce or remain passive after having personal knowledge thereof, or

(b) because of non-compliance with any condition relating to giving of notice to the Company with respect to which any other Insured shall be in default, solely because of the default or concealment of the default by any other Insured responsible for the loss or damage otherwise insured hereunder,

... insurance ... shall continue in effect with respect to each and every Insured who did not personally commit or personally aquiesce in or remain passive after having personal knowledge of such acts ...

The question is whether Section V is a severability clause, or, is a sufficient indication of the parties' intention to make the contract severable.

As ULICO points out, the severability clauses in *Shapiro II* and *Wedtech, supra,* were quite obvious.[9] · In *Shapiro II*, the severability clause stated that the policy was to be

construed as a separate contract with each Insured so that except as aforesaid, as to each Insured, the reference in this insurance to the Insured shall be construed as referring only to that particular Insured, and the liability of the Insurer to such Insured shall be independent of its liability to any other insured.

616 F.Supp. at 902. In *Wedtech*, the clause was even more clear, stating that "the written application for coverage shall be construed as a separate application for coverage" by each of the insured persons. 740 F.Supp at 216.

The real purpose of Section V of the ULICO contract, entitled "Waiver of Exclusions and Conditions," is to provide that insurance coverage will continue for "innocent" insureds when other insureds engage in behav-

asserting that it would not have taken out the policy had it known of Gaudet's misrepresentations on the application. By the time of the 1989 renewal, however, ULICO was dealing with an entirely new board of trustees. Thus, the renewal is not probative as to whether ULICO would have issued the policy to the old board of trustees in 1988 had it known of Gaudet's activities.

9. Section V of the contract does not resemble any of the sample severability provisions listed in a 1986 journal article on the subject. *See* Falkowski and Monteleone, "Misrepresentions in

the Applications for Directors' and Officers' Liability Insurance: Severability and Other Issues." Directors' and Officers' Liability Insurance and Self Insurance, 381 PLI/Comm 443, March 1986. In the article, the authors list four types of severability provisions. Three of them contain language explicitly referring to the representations in the application, as in *Wedtech*. The fourth contains language clearly indicting that the policy is to be construed as a separate contract as to each insured, as in *Shapiro II*.

ior prohibited by certain exclusions and conditions in the contract. These exclusions and conditions are found in sections of the contract entitled "Exclusions" and "Conditions." There are no provisions regarding misrepresentations on the application found in either of these sections.

Where the contract does not contain an easily identifiable severability provision, some courts have tried to determine whether the parties intended it to be severable. That is, would the parties have agreed to the contract for the innocent insureds, on the same terms, had the misrepresentations not occurred? *See Reserve Life Ins. Co. v. Lomolino,* 474 So.2d 1210, 1211 (Fla.App. 4 Dist.1985); *Farley v. Metropolitan Life Ins. Co.,* 125 Misc.2d 37, 480 N.Y.S.2d 82, 83 (1984). In *Lomolino,* for example, the court held that a woman's misrepresentations about *her* health on a joint health insurance policy should not preclude her husband from recovering benefits for *his* illness. The court reasoned that, even if the insurance company knew of the wife's representations, it would have insured the husband separately on the same terms. 474 So.2d at 1211–12.

The appropriate question here is whether the parties would have agreed to an insurance contract for the "innocent" trustees had Gaudet been honest on the application. Because of joint and several liability under ERISA, this inquiry is similar to the analysis, under La. R.S. § 22:619, of whether ULICO would have proceeded if it knew of Gaudet's embezzlements. Again, a rational factfinder could not find that ULICO would have proceeded to insure even the "innocent" trustees on the same terms had it known of Gaudet's defalcations. Thus, the illegal portion of the contract cannot be neatly separated from the legitimate portion. The contract is not severable.

The Court does not decide this question lightly. Whichever way a court rules on this question, it will cause hardship to an innocent party: either the innocent insureds who did not make any misrepresentation, or the innocent insurance company which was deceived. The court in *INA Underwriters v. Forde, supra,* summarized this situation well:

While this result may seem unfair to [the innocent insureds], who find themselves without insurance coverage through no fault of their own, a contrary decision would have resulted in similar hardship to the insurance company, which would find itself supplying coverage to a risk it never meant to insure. I agree with the Eastern District of Pennsylvania, which when faced with a similar situation, stated that "(w)hile we sympathize with (the innocent insureds') position, and recognize that innocent (employees) are likely to suffer if the entire policy is voidable because of one man's fraudulent response, it must be recognized that plaintiff insurers are likewise innocent parties. *Bird v. Penn Central Company,* 341 F.Supp. 291, 294 (1972).

630 F.Supp. at 77. Accordingly, this Court must grant ULICO's motion for summary judgment and deny plaintiffs' motion for summary judgment on the issue of ULICO's coverage.

## CONCLUSION

For the reasons set forth above,

IT IS ORDERED that plaintiffs' motion for summary judgment is DENIED. Plaintiffs' alternative motions for partial summary judgment on the issues of the trustees' liability and John Chancellor's liability are GRANTED. Plaintiffs' alternative motion for partial summary judgment on the issue of coverage under the ULICO policy is DENIED. ULICO's motion for summary judgment is GRANTED.